**MARIANAS PUBLIC LAND TRUST, Plaintiff–Appellee,**

v.

**GOVERNMENT OF the COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS; Marianas Public Land Corporation, Defendants–Appellants.**

No. 86–2956.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 5, 1987.

Decided Jan. 29, 1988.

R. Keith Partlow and Patricia Beatley, Asst. Attys. Gen., Saipan, CM, for defendants-appellants.

Theodore R. Mitchell, Saipan, CM, for plaintiff-appellee.

Before BROWNING, WRIGHT, and LEAVY, Circuit Judges.

LEAVY, Circuit Judge:

The Government of the Commonwealth of the Northern Mariana Islands and the Marianas Public Land Corporation appeal from the decision of the Appellate Division of the District Court for the Northern Mariana Islands. The appellate division held that funds transferred from the United States to the Commonwealth were rent from Commonwealth lands and ordered that the funds be paid over to the Marianas Public Land Trust. We reverse.

### FACTS AND PROCEEDINGS BELOW

The Northern Mariana Islands consist of sixteen small islands north of Guam. The islands were part of the United Nations Trust Territory of the Pacific Islands, administered by the United States. *See* H.J. Res. 233, 61 Stat. 397 (1947). In 1976, the Northern Mariana Islands entered into a commonwealth relationship with the United States. Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America, Pub.L. 94–241, 90 Stat. 263 (March 24, 1976), *reprinted in* 48 U.S.C. § 1681 at 298–307 (1987) and 1 C.M.C. B–101 [hereinafter Covenant]. The Covenant was contingent on the final termination of the Trusteeship Agreement, Covenant art. X, § 1003(c), an event which occurred on November 3, 1986. Proclamation No. 5564, 51 Fed.Reg. 40,399 (1986).

The Constitution of the Commonwealth of the Northern Mariana Islands (Commonwealth Constitution) established two agencies with divided responsibilities for the public lands. *Commonwealth Const.* art.

XI, §§ 4 & 6, *reprinted in* 1 C.M.C. B–320–22. The management and disposition of the public lands is the responsibility of the Marianas Public Land Corporation (Corporation). *Id.* at § 3. While the Corporation receives all moneys from the public lands, it must promptly transfer those moneys, less reasonable expenses of administration, to the Marianas Public Land Trust (Trust). *Id.* at § 5(g). The Trust has responsibility for investment of the money transferred, *id.* at § 6(b), and must transfer to the Commonwealth general fund any interest accrued less reasonable expenses. *Id.* at § 6(d).

Article VIII of the Covenant provided that the Commonwealth would make available to the United States certain properties on three of the Northern Marianas for "lease to enable it to carry out its defense responsibilities." Art. VIII, § 802(a). On the island relevant to this proceeding, Tinian, approximately 17,799 acres were to be leased. *Id.* at § 802(a)(1). The lease term was fifty years with an option for the United States to renew for an additional fifty year term. *Id.* at § 803(a). In exchange for the land, the United States agreed to pay $19,520,600, of which $17,500,000 was for the property on Tinian Island. The sums were to be adjusted according to the percentage change in the United States Department of Commerce's composite price index. *Id.* at § 803(b). The specific terms of the lease were set forth in a technical agreement executed simultaneously with the Covenant. *Id.* at § 803(c); Technical Agreement Regarding Use of Land to be Leased by the United States in the Northern Mariana Islands (February 15, 1975) [hereinafter Technical Agreement].

One of the matters covered by the Technical Agreement was the private ownership of certain lands on Tinian which the Commonwealth had agreed to lease to the United States. The Commonwealth agreed to remove all encumbrances and settle adverse possession claims on lands leased. Technical Agreement, pt. 1, subpt. 3. The Commonwealth also agreed to acquire the privately owned homestead parcels on these lands. *Id.* at pt. 1, subpt. 5.A.5.

Under the terms of the Technical Agreement, the Commonwealth agreed to execute the lease called for by the Covenant at the request of the United States so long as the request was made within five years of the effective date of §§ 802 & 803 of the Covenant. *Id.* at pt. 1, subpt. 2. The United States made such a request, and, on January 6, 1983, the Lease Agreement was signed. 1 C.M.C. C–401. The parties to the agreement were the United States on the one hand, and the Commonwealth, the Corporation, and the Commonwealth Ports Authority, on the other. The parties also entered into a Land Acquisition and Deferred Payment Agreement (Land Acquisition Agreement) on the same day. 1 C.M.C. C–501.

Under the Lease Agreement, the total adjusted rental to be paid by the United States was $33,000,000. Lease Agreement, art. 5(a)(3). The Land Acquisition Agreement divided the private property within the leased area on Tinian into three zones. Land Acquisition Agreement, art. 1(b). Fifteen percent of the land within the zones was privately held. The Commonwealth was given eighteen months, until July 6, 1984, to acquire the private land. *Id.* at art. 2(a). The United States immediately paid the Corporation $26,434,200 but withheld the balance of the rent because the Commonwealth had yet to acquire title to the private land. *See id.* at art. 3(b)(2)–(4). The balance, $6,565,800, was placed in a joint interest bearing account with the Bank of Hawaii. *Id.* at art. 4(a). Once the Commonwealth acquired title to the private lands within the three zones the funds would be released to the Corporation. *Id.* at art. 4(c). The effective date of the lease of the land in the three zones was postponed until the withheld funds were paid over to the Corporation. *Id.* at art. 1(b) & 5. Payment of the withheld amount was not due until the lease of the lands became effective. *Id.* at art. 3(b)(2)–(4). The amount due included any accrued interest on the withheld funds. *Id.*

The Commonwealth failed to acquire the private land by July 1984. On July 5, 1984, the parties amended the Land Acquisition Agreement. The amended agreement allowed the release of the funds and accrued

interest in the joint account on the condition that the Commonwealth provide evidence to the United States of ownership of the private lands or institute eminent domain proceedings for all unacquired parcels within sixty days of the release of the funds. Amendment to Land Acquisition and Deferred Payment Agreement, para. 2 (July 5, 1984) [hereinafter Amendment]. If the Commonwealth failed to complete either step within sixty days the unexpended funds, except funds deposited with the appropriate court for eminent domain proceedings, would revert to the joint account. Amendment at para. 4.

On July 10, 1984, the Commonwealth received $7,543,609.84, which included the $6,565,800 deposited initially plus all accrued interest. A portion of these funds has been used by the Commonwealth to acquire private land in the three zones. Most of the unexpended funds are in the custody of the Commonwealth Trial Court in connection with eminent domain actions. A small amount is held by the Commonwealth Director of Finance.

The Trust instituted this action in the Commonwealth Trial Court, Northern Mariana Islands on September 28, 1984, asserting that the funds transferred were "proceeds of the Public Lands" which were the Trust's property under the Commonwealth Constitution. The Trust requested a ruling that the July 10, 1984 transfer was unconstitutional and an order that the funds be paid over to the Trust. The Trust's motion for a preliminary injunction enjoining the Commonwealth's further expenditure of the funds was denied on October 10, 1984, on the ground that the funds were not money derived "from the public lands." The trial court concluded that the $6,565,800 and any interest accrued thereon constituted a "special fund established by the United States Government and the Commonwealth Government ... for the acquisition of the private interests in [the three zones]." The Commonwealth could use the money to acquire the private land, but any funds remaining must be paid over to the Trust under article IX, section 5(g) of the Commonwealth Constitution. The trial court reasoned that while the money was in the joint account it was not "from

the public lands" because the Corporation had no right to the funds. When the funds were released it was only on condition that the Commonwealth acquire the land; if the land was not acquired the funds reverted to the joint account. "It is only after the price tag for the private property acquisition is known and the written acceptance is given by the U.S. of evidence of title are the conditions of holding the funds by the Commonwealth Government satisfied and then, and only then, is the Government obligated to turn the balance over to [the Trust] as money from public lands."

The parties stipulated to entry of the order as a final judgment, and the judgment was timely appealed to the Appellate Division of the Northern Mariana Islands District Court. The appellate division reversed the trial court's decision, finding that the funds were "from the public lands" because the funds were withheld rent and remanded with instructions that the Commonwealth be ordered to pay the Trust $6,565,800 plus accrued interest. The Commonwealth and the Corporation timely appeal the appellate divisions's decision. The appellate division has stayed its decision pending appeal.

## JURISDICTION AND STANDARD OF REVIEW

This action was originally brought in the Commonwealth Trial Court, established pursuant to article IV, section 2 of the Commonwealth Constitution. While the Commonwealth may establish a local appeals court under article IV, section 3, it has not established such a court. Instead, the District Court for the Northern Mariana Islands has jurisdiction over appeals from the local trial court. 1 C.M.C. § 3301. When the district court sits as an appellate court, the court consists of three judges. Covenant, art. IV, § 402(c). The appellate division of the district court does not operate as a state supreme court but as part of the federal system. *Camacho v. Civil Service Commission*, 666 F.2d 1257, 1259–60 (9th Cir.1982). Appellate division decisions are appealable to the Ninth Circuit Court of Appeals under 48 U.S.C. § 1694c(b). *Id.* at 1260. On appeal to the circuit court, the appropriate standard of review of interpre-

tations of Commonwealth law by the appellate division is unclear. *See Guam v. Yang,* 800 F.2d 945, 946 (9th Cir.1986) (such interpretations must be affirmed "if they are based upon a tenable theory and are not manifestly erroneous") (citations omitted); *Guam v. Fegurgur,* 800 F.2d 1470, 1474 (9th Cir.1986) (applying de novo standard of review). It has been ordered that *Yang* be reheard en banc. *Guam v. Yang,* 833 F.2d 1379 (9th Cir.1987) (order that case be reheard en banc). We would reach the same result under either standard.

## DISCUSSION

■ The central issue in this appeal is whether the funds deposited in the joint account constitute revenue "from the public lands." Such revenue includes:

> payments for the transfer of freehold, leasehold and other interests made before the effective date of the Constitution by the government of the Northern Mariana Islands or any predecessor entity and transfers made by the [Marianas Public Land Corporation].

*Analysis of the Constitution of the Commonwealth of the Northern Mariana Islands,* 159 (1976).

The trust argues that the funds were rent payments for lease of public lands. The Commonwealth and the Corporation contend that the United States released the money, not for payment of rent, but for acquisition of the private land on Tinian. The Commonwealth's position is of greater merit.

The chronology of events supports the Commonwealth's position. The United States withheld the funds because the lands designated for rental were privately owned. At the time of withholding, the funds were not "from the public land" because the Commonwealth had yet to earn them. Similarly, at the time of release the lands were still in private hands. Only after these lands were publicly owned, could any payment be considered rent for use of public lands.

The language of the Land Acquisition Agreement and its Amendment evidence the intent of the contracting parties to: 1)

postpone the effective date of the lease in the three zones until the private lands were acquired; 2) postpone any duty to pay rent until those lands were publicly held; and 3) after the Commonwealth failed to acquire the lands by the July 1984 deadline, release the funds in the joint account so that the Commonwealth could proceed expeditiously with acquisition. The Amendment conditions the release of the funds on the Commonwealth's acquisition of the land or institution of eminent domain proceedings within sixty days. If this condition is not met, the funds revert back to the joint account. Thus, the United States and the Commonwealth intended to use the funds solely to acquire the private lands on Tinian. The same funds would have been rent had the Commonwealth owned the property. However, no rent was due, and the United States could spend the funds as it saw fit.

While the United States did not deposit the funds with a formal escrow agent, the joint account with the Bank of Hawaii served the same function: holding the funds until the Commonwealth performed the condition of their release. Thus, the principles governing operation of an escrow are applicable here.

■ Where an escrow is created, until performance of the condition on which delivery is to be made, legal title to the property placed in escrow remains in the depositor. *San Diego Wholesale Credit Men's Ass'n v. Garner,* 325 F.2d 862, 865 (9th Cir.1963) (construing California law); *see also* 30A C.J.S. *Escrows* § 9 (1965). In the absence of waiver, the condition must be performed within the time specified. 30A C.J.S. *Escrows* § 10(b) (1965). On nonperformance of the condition, the depositor is entitled to return of the property. *Id.* at § 12.

■ The Trust argues that the United States waived the condition of acquisition when it agreed to release of the funds. The following scenario is more likely: the Commonwealth failed to acquire the land on Tinian by the July 1984 deadline. As a consequence, the United States was entitled to return of the funds. However, the United States still wished to lease the property on Tinian for military purposes. To effectuate its desires, the United States

allowed the Commonwealth to use its funds to purchase the property.

The Commonwealth Trial Court ordered that the funds released from the joint account be expended solely for acquisition of the private lands on Tinian. Under the court's order, any excess funds, including accrued interest, after acquisition must be paid by the Commonwealth to the Corporation, which must disburse them to the Trust as money "from the public land." This result is sound. After acquisition, any excess funds are appropriately treated as rent.

## CONCLUSION

We find that the funds in the joint account were not "from the public lands" at the time they were released for acquisition of the private lands on Tinian. This result is consistent with the Commonwealth Constitution and the agreement between the United States and the Commonwealth. The decision of the appellate division is reversed and remanded with instructions to affirm the decision of the Commonwealth Trial Court.