100 F.3d 691
 GUAM SOCIETY OF OBSTETRICIANS AND GYNECOLOGISTS, GUAM NURSES ASSOCIATION; THE REVEREND MILTON H. COLE, JR.; LAURIE KONWITH; EDMUND A. GRILEY, M.D.; WILLIAM S. FREEMAN, M.D.; AND JOHN DUNLOP, M.D.; ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED, AND ALL THEIR WOMEN PATIENTS, PLAINTIFFS-APPELLEES,
v.
JOSEPH F. ADA, IN HIS PERSONAL AND OFFICIAL CAPACITIES, ET AL., DEFENDANTS-APPELLANTS.
 No. 94-15070
 United States Court of Appeals,
Ninth Circuit
 Argued ans Submitted May 1, 1995.
Decided: November 7, 1996.
 
 Maria Fitzpatrick, Agana, Guam (argued); Arnold H. Leibowitz, Special Assistant Attorney General for Guam, Washington, D.C., for the defendant-appellant.
 Simon Heller, The Center for Reproductive Law & Policy, New York, New York (argued); Anita Arriola, Arriola, Cowan & Bordallo, Agana, Guam (argued), for the plaintiffs-appellees.
 Appeal from the United States District Court for the District of Guam, Alex R. Munson, Chief Judge, Presiding. D.C. No. CV-90-00013-ARM.
 Before: Pregerson, Kozinski and Hawkins, Circuit Judges.
 HAWKINS, Circuit Judge:
 
 
 1
 Defendants-appellants Joseph Ada, Governor of Guam, and other territorial officials appeal the district court's award of attorneys' fees under 42 U.S.C. 1988 to plaintiffs-appellees Guam Society of Obstetricians & Gynecologists, Guam Nurses Association ("GNA"), Dr. Edmund A. Griley, Dr. William S. Freeman, Dr. John Dunlop, Reverend Milton H. Cole, Jr. and Laurie Konwith. The fee award arises out of plaintiffs' successful constitutional challenge to Guam's anti-abortion statute. We previously vacated the initial award of attorneys' fees and remanded for the district court to consider intervening case law. On remand, the district court reinstated the full amount of the original award and also awarded plaintiffs interest from the date of the initial fee award as well as interim fees. This appeal concerns the district court's decision on remand.
 
 I. BACKGROUND
 A. Underlying Litigation
 
 2
 In March of 1990, plaintiffs brought an action challenging the constitutionality of Guam Public Law 20-134, which outlawed virtually all abortions on Guam. The district court declared the law unconstitutional and granted plaintiffs' request for a permanent injunction against its enforcement. We affirmed. See Guam Soc'y of Obstetricians and Gynecologists v. Ada, 776 F. Supp. 1422 (D. Guam 1990), aff'd 962 F.2d 1366 (9th Cir.), cert. denied, 506 U.S. 1011, 121 L. Ed. 2d 564, 113 S. Ct. 633 (1992) ("GSOB/GYN").
 
 B. Initial Attorneys' Fee Award
 
 3
 On June 25, 1991, the district court awarded plaintiffs attorneys' fees and costs under 1988 in the total amount of $443,642.56. Most of the plaintiffs were represented locally by the law firm of Arriola, Cowan & Bordallo ("AC&B"). GNA and Laurie Konwith were represented by the American Civil Liberties Union's Reproductive Freedom Project ("ACLU-RFP"), which is based in New York. An attorney from the Guam office of the ACLU also worked on the case.
 
 1. Local Counsel
 
 4
 The district court awarded fees for local counsel based upon hourly rates between $150.00 and $200.00 per hour.[1] The district court determined that these rates reflected the "prevailing market rates" for lawyers of similar skill and experience. In setting the hourly rate, the district court also found that:
 
 
 5
 each attorney's skills contributed to the successful result, which was achieved in a compressed time frame. Each attorney still faces the prospect of no recovery of fees or costs.
 
 
 6
 The district court then calculated the lodestar by multiplying these hourly rates by the number of hours reasonably spent on the litigation.
 
 
 7
 The district court also concluded that this was a "rare and exceptional case" which warranted a multiplier of 2.0 to the lodestar figure for AC&B. The district court relied in part on the contingent nature of local counsel's representation. However, the district court also found that plaintiffs would have faced substantial difficulty in securing other counsel to represent them and that this was an "undesirable" case given its visibility and controversial nature in Guam's small and predominantly Catholic community.
 
 2. Off-Island Counsel/ACLU-RFP
 
 8
 The district court determined that the prevailing market rates for ACLU-RFP counsel were between $25.00 and $241.00 per hour.[2] These rates were supported by affidavits from other New York attorneys. The district court also mentioned the following factors in justifying the rates: (1) the attorneys' skill and experience; (2) the novel legal issues the case presented; (3) the distance between New York (where the ACLU-RFP attorneys practice) and Guam; (4) the short time frame in which the case was litigated; (5) the results obtained; (6) the lack of legal resources available on Guam; and (7) the possibility that no fees or costs would be recovered. It declined to apply any lodestar multiplier to the ACLU-RFP award.
 
 C. Appeal From Attorneys' Fees Award
 
 9
 In December of 1991, defendants appealed the fee award. Defendants argued that the district court erred in considering contingency risk in calculating the lodestar figure and in applying a multiplier. This argument was based upon several post-award decisions. See City of Burlington v. Dague, 505 U.S. 557, 120 L. Ed. 2d 449, 112 S. Ct. 2638 (1992); Gates v. Deukmejian, 987 F.2d 1392 (9th Cir. 1992); Davis v. City and County of San Francisco, 976 F.2d 1536 (9th Cir. 1992), vacated in part on other grounds, 984 F.2d 345 (9th Cir. 1993). In Dague, the Supreme Court held that enhancement above the lodestar amount for contingency risk is not proper for fee awards under 42 U.S.C. 6972(e) or 33 U.S.C. 1365(d). Davis extended Dague to calculation of the lodestar itself, and Gates extended Dague to 1988 fee awards. We therefore vacated the attorneys' fees award and remanded for the district court to consider these cases.
 
 
 10
 Defendants also argued that the district court erred by awarding attorneys' fees for the ACLU-RFP work performed on behalf of plaintiffs GNA and Laurie Konwith, who, defendants maintained, did not have standing. We instructed the district court to consider the standing issue on remand.
 
 D. Attorneys' Fees Award On Remand
 
 11
 On remand, the district court declined to reduce the lodestar figure it calculated for local and ACLU-RFP counsel and also declined to reduce the 2.0 multiplier for AC&B. It concluded that even without considering the contingency risk, the hourly rates and multiplier were justified. The district court also rejected defendants' standing arguments. The district court awarded interest on all fees and costs to run from the date of the entry of initial judgment as well as interim "uncontested" fees to AC&B. The total amount of the award was $552,790.92.
 
 
 12
 Defendants now appeal the district court's decision on remand. Defendants contend the district court erred in determining counsel's hourly rate and in refusing to eliminate, or at least reduce, the multiplier upon remand. They also challenge the award of fees against the Governor of Guam and the award of interest.
 
 II. STANDARD OF REVIEW
 
 13
 A district court's decision to award fees and their amount is reviewed for abuse of discretion. Bouman v. Block, 940 F.2d 1211, 1235 (9th Cir.), cert. denied, 502 U.S. 1005, 116 L. Ed. 2d 658, 112 S. Ct. 640 (1991). "The abuse of discretion standard applies not only to the basic fee computation, but also to the multiplier." Id. Factual findings supporting an award are reviewed for clear error. Price v. Seydel, 961 F.2d 1470, 1475 (9th Cir. 1992). Whether the district court applied the correct legal standard is reviewed de novo. Notrica v. FDIC, 2 F.3d 961, 964 (9th Cir. 1993).
 
 III. DISCUSSION
 A. AC&B Award
 42 U.S.C. 1988 provides in relevant part:
 
 14
 In any action or proceeding to enforce a provision of section[ ] . . . 1983 . . . of this title . . . the district court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.
 
 
 15
 42 U.S.C. 1988(b). "Reasonable fees" under 1988 "are to be calculated according to the prevailing market rates in the relevant community, regardless of whether plaintiff is represented by private or non-profit counsel." Blum v. Stenson, 465 U.S. 886, 79 L. Ed. 2d 891, 104 S. Ct. 1541 (1984). The burden is on the plaintiff to demonstrate "that the requested rates are in line with those [rates] prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." Id. at 895 n. 11.
 
 1. Hourly rates
 
 16
 There is no dispute here that the relevant community for the AC&B award is Guam. In setting the hourly rates, the district court properly considered declarations from Guam attorneys regarding the prevailing market rates. See Davis, 976 F.2d at 1547 ("We recently pronounced that declarations of the 'prevailing market rate in the relevant community . . . [are] sufficient to establish the appropriate [billing] rate for lodestar purposes.'") (alteration in original) (quoting Bouman, 940 F.2d at 1235).
 
 
 17
 Those affidavits clearly support the district court's determination that $175 per hour is the prevailing market rate for Ms. Arriola's services. For example, J. Bradley Klemm submitted an affidavit stating that $175 "is reasonable and well within the range of billing rates for attorneys on Guam for a case of this magnitude and controversy." James S. Brooks, who has practiced law on Guam since 1968, submitted an affidavit stating that $300 an hour would be reasonable given the complexity of the case, Ms. Arriola's experience in class action litigation, and the considerable hostility the suit engendered in the community. He further stated that he was "frankly surprised" at AC&B's usual hourly rates and that those rates seemed low when compared to the rates of other firms with which he was familiar. G. Patrick Civille submitted an affidavit stating that his firm would charge $200 an hour "for having a comparably experienced attorney handle a similar matter." Although defendants submitted affidavits suggesting that the prevailing market rate for Ms. Arriola's service would be less than $175 per hour, it was well within the district court's discretion to credit the affidavits supporting the $175 figure.
 
 
 18
 Our colleague in Dissent argues against an hourly rate of more than $150 for Ms. Arriola. Dissent at 14602. Were the standard of review de novo, our colleague might be on firmer ground. However, a district court's finding is not clearly erroneous simply because an appellate Judge would reach a different Conclusion. "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." Service Employees Int'l Union v. Fair Political Practices Comm'n, 955 F.2d 1312, 1317 n. 7 (9th Cir.) (quoting Anderson v. City of Bessemer, 470 U.S. 564, 573-74, 84 L. Ed. 2d 518, 105 S. Ct. 1504 (1985)), cert. denied, 505 U.S. 1230 (1992).[3]
 
 
 19
 Furthermore, it is perfectly appropriate for a district court to award an hourly rate higher than is customarily charged by the plaintiff's attorney or than is set forth in the retainer fee agreement. See Maldonado v. Lehman, 811 F.2d 1341, 1342 (9th Cir.) (counsel's customary rate is not controlling), cert. denied, 484 U.S. 990, 98 L. Ed. 2d 509, 108 S. Ct. 480 (1987); Blanchard v. Bergeron, 489 U.S. 87, 96, 103 L. Ed. 2d 67, 109 S. Ct. 939 (1989) (pre-existing fee agreement does not limit the amount of fees awardable under 1988).
 
 
 20
 Having reviewed the affidavits, we conclude that the rates employed by the district court were in line with the prevailing market rates in Guam for attorneys of similar skill, reputation and experience handling similar matters. We further conclude, as did the district court, that the rates employed were fully justified quite apart from any consideration of contingency.
 
 2. Multiplier
 
 21
 Upon remand, the district court again applied a 2.0 multiplier to the lodestar figure. Acknowledging that contingency did factor into its original decision to enhance the lodestar figure, the district court noted that "the more important considerations . . . were the extreme undesirability of the case, the likelihood that no other attorney on island would have accepted the case, and the rare and exceptional nature of the case, particularly in the small island community of Guam." Thus, the district court found the 2.0 multiplier appropriate even without considering the contingency. The district court did not, as the Dissent suggests, consider that counsel was precluded from other employment because of the time spent on this litigation as a reason justifying the fee award we now affirm. Nor did the district court apply a multiplier because of the "absence of other local counsel competent to handle this case." Dissent at 14603-04 & n.30. Rather, the district court found it unlikely that other qualified attorneys would have taken the case.[4]
 
 
 22
 We disagree with defendants' contention that a multiplier may never be applied to increase a fee award after Dague. The Dague opinion only discussed the permissibility of applying a multiplier to reflect that the prevailing party's attorneys were retained on a contingency fee basis. Dague left undisturbed earlier Supreme Court case law allowing a fee applicant to recover more than the lodestar figure where the applicant has met "the burden of showing that 'such an adjustment is necessary to the determination of a reasonable fee.'" Dague, 505 U.S. at 562 (emphasis added) (quoting Blum, 465 U.S. at 898).
 
 
 23
 Moreover, we disagree with the Dissent that the unavailability of willing local counsel is not a proper factor justifying an enhancement of the lodestar. Such an enhancement is clearly necessary to a reasonable fee where the district court finds that the case is of the type that attorneys are unwilling to take for fear of ostracization and out of concern for their personal safety. Such a consideration is not ordinarily reflected in the lodestar, and we find that it was clearly not reflected in the lodestar in this particular instance. See Stewart, 987 F.2d at 1454 (recognizing that, after Dague, enhancement is still appropriate in limited circumstances on the basis of factors not fully reflected in the basic fee).[5]
 
 
 24
 In the alternative, the Dissent contests the district court's factual finding that plaintiffs were unlikely to have found other local counsel. In this regard, the district court was faced with a credibility determination. Plaintiffs presented the affidavit of J. Bradley Klemm, who stated that "most local firms would be unlikely to accept a case such as GSOBYN " given the position of the Catholic church on the issue and the class action nature of the lawsuit and that had AC&B "not pursued this case, the plaintiffs would have found it extremely difficult, if not impossible, to obtain local experienced counsel." On the other hand, defendants presented the affidavit of Linda Ingles who stated she did not believe "that the ACLU and the Plaintiffs would have experienced difficulty in obtaining local counsel so that the challenge to the law could proceed in federal court" because the plaintiffs in a Guam asbestos class action suit had no difficulty obtaining local counsel. We cannot say that the district court clearly erred in choosing to believe one affidavit rather than the other, especially in this case, where the basis for Klemms' opinion appears more relevant.
 
 
 25
 Nonetheless, the Dissent insists that the district court's finding that there was a likelihood no other attorney on Guam would have taken the case is clearly erroneous because AC&B did take the case and GNA and Laurie Konwith were able to get off-island counsel. The Dissent also speculates that because plaintiffs were able to obtain declarations from various Guam residents who oppose the law, plaintiffs likely could have found other local counsel.
 
 
 26
 A district court's factual findings are reviewed in light of the record, not speculation. Although one could speculate that other attorneys on Guam might have agreed to represent plaintiffs if offered the opportunity because lawyers have a moral obligation to represent those with unpopular views and might be able to sign a million dollar book deal when the case is over (Dissent at 14615 n.38), one could just as easily speculate that only a lawyer with a strong pro-choice philosophy and extensive public interest law experience would have taken this case, of which one could speculate there are few on Guam. However, as Judges, we are not permitted to engage in such speculation. We are confined to the evidence in the record and those inferences that directly follow from that evidence. Based upon the record in this case, the district court was not clearly wrong in its Conclusion that plaintiffs were unlikely to find other local counsel.
 
 
 27
 Moreover, that two of the other plaintiffs hired off-island counsel, on this record, seems to us to support, rather than contradict, the district court's finding that there was a "likelihood that no other attorney on island would have accepted the case."
 
 
 28
 Contrary to the Dissent's contention, neither the majority here nor the district court in its original order "paint[ ] a picture of an island community where the public is virtually of one mind on the question of abortion, and where all Dissent on the issue is quickly stifled."[6] Rather, the district court cogently explained why it believed it was unlikely that plaintiffs could have obtained other local counsel:
 
 
 29
 The record reflects that plaintiffs' local attorneys accepted this case in the face of a unanimous Legislature, as well as a Governor who had taken a strong personal and political stand on the issue, despite both having been advised by the Attorney General that the law was unconstitutional. The Roman Catholic Church had also spoken publicly, even threatening excommunication of opponents of the law. Ms. Arriola's affidavit states that she received death threats,[7] and encountered overt hostility from members of the community. The Court notes, and the record supports, that Guam is a relatively small and predominantly Catholic community and that this lawsuit was particularly emotionally-charged. Declarations of other local attorneys also indicate that plaintiffs would have had much difficulty finding local counsel, due to the high visibility of the case, the small size of the island, and the many conflicts of interest occasioned by the many parties involved. There is no doubt in my mind that this case was deemed extremely undesirable in the community and that local counsel faced unusual and trying personal and professional pressures during the pendency of this lawsuit.
 
 
 30
 Not being residents of Guam and given the record on appeal, we are not in a position to doubt the district court's view of the dynamics surrounding this case.
 
 
 31
 Moreover, that the people of Guam are not of "one mind" or that plaintiffs were able to find various Guam residents, mostly health care providers whose livelihoods are directly affected by the law, who are willing to speak out against the law, does not in any way detract from the district court's finding that most lawyers on Guam would not have taken this case.[8] Although the United States is hardly of "one-mind" on the issue of abortion, physicians are more and more reluctant to provide abortions in this country because of threats of ostracization and violence.[9] It is not clearly wrong to find that, for similar reasons, lawyers are likely to be reluctant to provide legal representation to individuals challenging anti-abortion statutes. In sum, there is no reason to disbelieve Mr. Klemm's affidavit that plaintiffs would have found it "extremely difficult, if not impossible" to obtain experienced local counsel. Consequently, the district court did not err in enhancing the lodestar figure based upon this factor. Cf. Gomez v. Gates, 804 F. Supp. 69, 75 (C.D. Cal. 1992) (concluding that Dague does not preclude enhancement for "undesirability" of excessive force case).
 
 
 32
 Finally, defendants contend that because contingency was a factor in the original decision, the district court necessarily should have reduced the multiplier on remand. We disagree. As long as the district court's 2.0 multiplier can be justified on the bases it mentioned in its remand decision - without regard to contingency - it may be upheld. See Fadhl v. City and County of San Francisco, 859 F.2d 649, 651 (9th Cir. 1988) (affirming district court's choice of 2.0 multiplier despite its reliance on impermissible factors where the permissible factors alone amply supported the result). We find that the magnitude of the multiplier applied by the district court was reasonable in light of the factors upon which it relied.
 
 3. Time spent
 
 33
 The Dissent questions plaintiffs' litigation strategy; whether, for example, it was appropriate for counsel to engage in certain discovery[10] and to spend as much time as they did preparing the summary judgment motion. But the Dissent fails to mention that the reasonableness of the number of hours was irrelevant to the district court upon remand and irrelevant to us on appeal because defendants do not challenge the number of hours for which plaintiffs request fees[11] and we do not generally consider arguments not raised by the parties. See Blackburn v. Goettel-Blanton, 898 F.2d 95, 97 n. 6 (9th Cir. 1990).
 
 
 34
 Furthermore, although it may be easy, in hindsight, to tout this as an easy case,[12] plaintiffs cannot be faulted for their thoroughness under the circumstances.[13] Although one could argue that plaintiffs need only have pled the legal theory that actually carried the day rather than the six additional theories pled, one must remember the status of Roe was extremely tenuous after Webster v. Reproductive Health Services, 492 U.S. 490, 106 L. Ed. 2d 410, 109 S. Ct. 3040 (1989), which was decided less than a year before this lawsuit was brought.[14]
 
 
 35
 The Dissent questions the relevance of many of the affidavits submitted to support plaintiffs' claims. In fact, many of the criticized affidavits are directly relevant. For example, the affidavits regarding the effect of the statute on doctors and nurses were directly relevant to plaintiffs' claim that the statute is void for vagueness and violates the right to free speech. The affidavits regarding the subjugation of women on Guam and the medical benefits of abortion are relevant to plaintiffs' claim that the law violated the equal protection clause and the thirteenth amendment right to be free from slavery by robbing women of their bodily integrity and dignity and risking their lives and health.
 
 
 36
 Moreover, although it makes a much better study in contrasts to compare plaintiffs' motion for summary judgment with the eight paragraph opinion of the Guam Attorney General, the relevant comparison for purposes of determining whether plaintiffs' counsel spent inordinate amounts of time preparing their motion for summary judgment is between the motion and defendants' response in opposition. If plaintiffs' motion and accompanying declarations were as irrelevant and needlessly verbose as the Dissent contends, defendants did not deem it appropriate to bring it to the attention of the district court. Rather, they saw fit to file a 65 page response supported by 108 pages of declarations and other attachments touching on topics similar to those addressed by plaintiffs. For example, several of the declarations defendants submitted are personal testimonials of women who have undergone abortions and who describe the physical, psychological and emotional pain they experienced from their abortions. Other declarations touch on such topics as the concept that life begins at conception,[15] the developmental stages of embryos and fetuses,[16] words in the Chamorro language that refer to pregnancy and the birthing process,[17] and the various methods of performing abortions.[18] Defendants also include a newspaper article regarding physicians who do and do not perform abortions and the reasons why.[19] Even if the reasonableness of the number of hours for which fees were awarded was at issue, we could not say, on this record, that the district court abused its discretion in awarding fees for the hours it did.
 
 B. ACLU-RFP Award
 1. Standing
 
 37
 Defendants argue that GNA and Laurie Konwith are not entitled to attorneys' fees because they do not have standing. The district court found that GNA has standing because its members were subject to criminal prosecution under the statute. Specifically, the district court found:
 
 
 38
 The GNA is a non-profit organization of 90 nurses who are registered on Guam and who provide medical care and treatment including abortion counselling and referral information to pregnant women. Every member of GNA was subject to criminal prosecution under the law, both for providing counselling and for participating in abortions.
 
 
 39
 Defendants note that under Guam law, persons who are not licensed as physicians may not perform abortions. 10 Guam Code Ann., Ch. 13, Arts. 1-3 (193). Defendants contend that members of GNA are not legally entitled to perform abortions and therefore are not subject to prosecution under the statute. Although members of GNA may not be legally entitled to perform abortions, defendants have failed to demonstrate that GNA members are not allowed to and do not assist those who are legally entitled to perform abortions. It is clear that members of GNA would have been subject to prosecution for assisting a licensed physician during an abortion procedure given Guam's conspiracy laws. See 9 Guam Code Ann. 4.60 (Guilt Established by Conspiracy); 4.65 (Criminal Facilitation Established and Punished); 13.30 (Conspiracy: Definition). Consequently, GNA had standing to bring this action as a representative of its constituents. Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. 333, 342, 53 L. Ed. 2d 383, 97 S. Ct. 2434 (1977).
 
 
 40
 Defendants also contend that district court erred in concluding that the law did not prohibit abortion counselling. We disagree. The district court was likely relying upon 31.23, which made it a misdemeanor to "solicit[ ] any woman to submit to any operation." This section certainly could have been construed as effectively prohibiting abortion counselling. In fact, we note that Janet Benshoof was arrested under this provision immediately after giving a speech to the Guam Press Club in which she informed the audience that abortions could be obtained in Hawaii and gave a phone number for further information. GSOB/GYN, 776 F. Supp. at 1426. In sum, it is beyond doubt that GNA had standing to contest the constitutionality of the statute.
 
 
 41
 Although a fee award is made to a party, not to an attorney, we need not determine whether Ms. Konwith has standing because where, as here, two parties are represented by the same counsel who performed work benefiting both parties and the parties for all practical purposes present one fee request, that one party has standing is sufficient to justify the award of fees.[20]
 
 2. Hourly Rates
 
 42
 Defendants argue that the district court erred when it did not reduce the hourly rates it originally used to calculate the ACLU-RFP award. In its original order, the district court did mention that the ACLU-RFP attorneys faced the risk of not recovering fees as one of many factors justifying the hourly rates. However, it is clear from that order as well as the order on remand that the district court's primary focus was properly on the prevailing market rate for lawyers of the same skill, reputation and experience as the ACLU-RFP lawyers. The fees set by the district court were supported by affidavits from lawyers with two prominent private law firms in New York, as well as affidavits from the ACLU-RFP attorneys establishing their extensive skill and experience.
 
 
 43
 Defendants do not challenge the qualifications or skill of the ACLU-RFP attorneys. Nor do they contend that New York is not the relevant community for determining the prevailing market rate. Instead, they argue that the district court erred by not considering the ACLU's "customary and ordinary" fees. It is well-settled that fees "are to be calculated according to the prevailing market rates in the relevant community, regardless of whether plaintiff is represented by private or nonprofit counsel." Blum, 465 U.S. at 895; see also Miele v. New York State Teamsters Conference Pension & Retirement Fund, 831 F.2d 407, 408-09 (2nd Cir. 1987) (court may apply prevailing market rates for "Wall Street" firm to fee award for non-profit organization). Such a rule is necessary because public interest, non-profit firms may not charge their clients fees. Defendants have failed to demonstrate that the district court erred in assessing the skills of the ACLU-RFP attorneys or abused its discretion in relying on the affidavits establishing rates for private New York attorneys. The ACLU-RFP hourly rates will therefore be upheld.
 
 C. Interest
 
 44
 On remand, the district court awarded interest on all fees to run from November 12, 1991, the date of initial entry of judgment. Defendants argue that interest should only run from the date of the district court's decision on remand. We review the district court's award of interest for abuse of discretion. Home Sav. Bank F.S.B. v. Gillam, 952 F.2d 1152, 1161 (9th Cir. 1991).
 
 28 U.S.C. 1961(a) provides:
 
 45
 Interest shall be allowed on any money judgment in a civil case recovered in a district court. . . . Such interest shall be calculated from the date of the entry of judgment.
 
 
 46
 The purpose of this provision is to compensate successful plaintiffs for the lost time between the ascertainment of the damage and the receipt of payment. Kaiser Aluminum & Chem. Corp. v. Bonjorno, 494 U.S. 827, 835-36, 108 L. Ed. 2d 842, 110 S. Ct. 1570 (1990). Like other circuits, we have rejected the idea that "post-judgment interest should apply only from the date of the second judgment whenever the first judgment is reversed and remanded." Handgards, Inc. v. Ethicon, Inc., 743 F.2d 1282, 1298 (9th Cir. 1984), cert. denied, 469 U.S. 1190, 83 L. Ed. 2d 968, 105 S. Ct. 963 (1985); see also Perkins v. Standard Oil Co. of California, 487 F.2d 672, 676 (9th Cir. 1973). We agree with the Sixth Circuit that determining from which judgment interest should run "requires an inquiry into the nature of the initial judgment, the action of the appellate court, the subsequent events upon remand, and the relationship between the first judgment and the modified judgment." Bailey v. Chattem, Inc., 838 F.2d 149, 154 (6th Cir.), cert. denied, 486 U.S. 1059, 100 L. Ed. 2d 931, 108 S. Ct. 2831 (1988); see also Reaves v. Ole Man River Towing, Inc., 761 F.2d 1111, 1112 (5th Cir. 1985) ("Unless the mandate of the appellate court alters the original judgment in more than relatively minor respects, interest should attach from the date of the pre-appeal judgment"); Graefenhain v. Pabst Brewing Co., 870 F.2d 1198, 1211 (7th Cir. 1989).
 
 
 47
 Applying these principles to the case at hand suggests that the district court was correct in awarding interest from the date of entry of the original judgment. It is significant that we vacated the district court's original attorney's fees award so the district court could consider intervening case law. We did not reverse the district court, nor did we conclude that the district court's award was erroneous or unsupported. This case is therefore clearly distinguishable from those cited by defendants, where the original judgment was reversed on the merits or found to be wholly unsupported by the evidence. Cf. Black Grievance Comm. v. Philadelphia Elec. Co., 690 F. Supp. 1393, 1406 (E.D. Pa. 1988) (awarding interest on recalculated fee award from date of original award, notwithstanding fact that original award was vacated by court of appeals). Our decision today is not contrary to Kaiser because Kaiser simply precludes the award of post-judgment interest from the date of initial judgment where it has been determined that the initial judgment was not supported by the evidence. Because we did not previously determine whether the initial award was supported by the evidence and because we now conclude that the district court's original fee award was supported by the factors it mentioned - without regard to contingency - interest clearly should have been awarded from the date of the original award. See Mt. Hood Stages, Inc. v. Greyhound Corp., 616 F.2d 394, 406 (9th Cir. 1980) (noting that in cases allowing interest only from the date of judgment after remand, there was no "basis for recovery of the amount on which interest was sought until the appellate court reversed and remanded for entry of judgment").
 
 
 48
 Defendants contend that the interest should not run from the original judgment because we did not mention the award of interest in the mandate vacating and remanding the case to the district court. They base their argument on Fed. R. App. P. 37 which provides in relevant part:
 
 
 49
 If a judgment is modified or reversed with a direction that a judgment for money be entered in the district court, the mandate shall contain instructions with respect to the allowance of interest.
 
 
 50
 Rule 37 is inapposite because we never directed that a money judgment be entered in the district court. To the contrary, we vacated the money judgment so the district court could reconsider its ruling.
 
 
 51
 The district court did err, however, insofar as it awarded interest from the date of entry of the original judgment on fees that were awarded for the first time on remand. Those fees represent work performed after the original fee award was vacated. The district court should not have awarded interest on those fees as of the date of the original fee award because the work had yet to be performed. See Perkins, 487 F.2d at 676; United States v. Hougham, 301 F.2d 133, 135 (9th Cir. 1962); see also Institutionalized Juveniles v. Secretary of Pub. Welfare, 758 F.2d 897, 927 (3rd Cir. 1985).
 
 D. Interim Fees
 
 52
 Defendants also challenge the district court's award of interim fees on remand. However, defendants cite no persuasive authority for their position that interim fees were unwarranted. We have previously recognized that "there is no reason to delay receipt of . . . undisputed fees." Fadhl v. City and County of San Francisco, 804 F.2d 1097, 1099 (9th Cir. 1986) (noting that delays in the payment of fees may deter attorneys from undertaking representation). Here, the district court awarded interim fees to AC&B only at the uncontested rate of $120.00 per hour. Defendants' implication in its brief that these fees were contested is not supported by the record. At oral argument on remand, the district court specifically asked about this:
 
 
 53
 The Court: "You don't dispute that $120 per hour for all the hours she claimed, do you?"
 
 
 54
 Defense Counsel: "No."
 
 
 55
 Defense counsel also stated that "if any of the fees are contested . . . it's the fees of the ACLU." On this record, the district court did not abuse its discretion by awarding interim fees.
 
 E. Fees Against The Governor Of Guam
 
 56
 The final argument raised by defendants is that no fees may be awarded against the Governor of Guam because he is not a "person" within the meaning of 1983. This argument was raised and rejected in the merits appeal. See GSOB/GYN, 962 F.2d at 1370-71. Defendants claim that an intervening Supreme Court opinion, Suter v. Artist M., 503 U.S. 347, 118 L. Ed. 2d 1, 112 S. Ct. 1360 (1992), suggests that the issue was improperly decided. However, Suter was actually decided before the merits appeal was decided, and, in any event, is inapplicable.[21] In addition, defendants have clearly waived the right to argue the issue in this appeal, since they did not pursue it in their petition for certiorari challenging the merits appeal or in any of the prior fee proceedings.
 
 F. Motion For Sanctions
 
 57
 Plaintiffs filed a separate motion for sanctions, under Rule 38, Federal Rules of Appellate Procedure, and 28 U.S.C. 1927, based upon defendants' inclusion of the above argument in their brief on appeal. We have carefully reviewed the record and conclude that sanctions are not warranted. This issue was only one of many raised by defendants in this appeal. As we have previously stated, "Fed. R. App. P. 38 authorizes sanctions for a frivolous 'appeal,' not for a frivolous argument." Harris v. Polskie Linie Lotnicze, 820 F.2d 1000, 1005 (9th Cir. 1987). Moreover, we find no evidence that defendants acted in "bad faith" so as to warrant sanctions under 1927. See T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 628 (9th Cir. 1987). The motion for sanctions is denied.
 
 IV. CONCLUSION
 
 58
 We affirm the district court's award of fees on remand, except to the extent that the district court imposed interest from the date of the initial judgment on fees for work that was performed after the initial judgment. We remand to the district court for proceedings consistent with this opinion. Costs on appeal to plaintiffs-appellees.
 
 KOZINSKI, Circuit Judge, Dissenting in part:
 
 59
 "I would have to say that [in] eight years on the bench, this is the easiest issue that I've ever been confronted with."
 
 Judge Alex R. Munson[1]
 
 60
 "Contrary to conventional wisdom, Guam is apparently not overwhelmingly 'pro-life.'"
 
 
 61
 Anita P. Arriola, Esq. & Simon Heller, Esq.[2]
 
 
 62
 The majority opinion, and the district court orders it affirms, give the distinct impression that the lawyers of Guam and Saipan[3] are a bunch of spineless yokels - unfit to handle complex cases, daunted by tough legal issues, strangers to constitutional litigation, cowed by public opinion and lacking the pluck to stand up for the rights of their fellow citizens. The same documents also suggest that the underlying litigation - for which plaintiffs' attorneys are awarded hundreds of thousands of dollars - was immensely difficult and required formidable legal skills. Finally, one is led to believe that the people of Guam are of one mind in opposing abortion, and that the very few who disagree live in fear of their lives and livelihoods.
 
 
 63
 None of this is true.
 
 
 64
 This is not a case where plaintiffs tried to get a lawyer but were repeatedly rebuffed. Cf. Fadhl v. City and County of San Francisco, 859 F.2d 649, 651 (9th Cir. 1988)(per curiam)(Fadhl was turned down by 35 attorneys; court applied multiplier in light of this "extraordinary difficulty" finding representation). So far as the record discloses, the Guam Society of Obstetricians and Gynecologists (GSOBGYN) retained the very first lawyer it contacted; the other plaintiffs did not consult local counsel at all, but hired lawyers who came from another hemisphere (35 hours of flight time - all billed at New York City rates).[4] Plaintiffs were, of course, free to hire the attorneys, local or otherwise, in whom they had confidence. But they were not entitled to have someone else pay extraordinary legal fees when there were plenty of local lawyers who could have handled the case at normal rates. The contrary finding - which is the fulcrum of the district court's ruling and our opinion today - is an affront to the dignity and reputation of a community of lawyers who have consistently served their clients and this court with professionalism and dedication.
 
 
 65
 Furthermore, the case was laughably easy. Long before suit was filed, Guam's attorney general - appointed by the same governor who signed the abortion bill - wrote a terse opinion letter predicting with surgical precision the outcome of the litigation. See App. A. The district Judge's finding that this was a hard case is belied by the record and his own words and rulings. See pp. 14588-89 infra. Finally, the insulting suggestion that the people of Guam do not hold, and cannot tolerate, a diversity of views on the question of abortion is refuted by plaintiffs themselves.
 
 
 66
 The record thus provides no justification for the number of hours, the hourly rates or the multiplier approved by the district court. The fee award here is not reasonable compensation for services prudently rendered; it is a bounty paid to plaintiffs' lawyers for having reeled in a fat and rather sluggish fish. We abjure our responsibility by affirming this punitive award.
 
 The Underlying Litigation
 
 67
 On March 8, 1990, the Guam territorial legislature passed "the most restrictive anti-abortion law enacted under the U.S. flag." Decis. and Order After Remand re Award of Att'y Fees and Costs (Second Fee Award), CR 340, at 7. The law was a frontal assault on Roe v. Wade, 410 U.S. 113, 35 L. Ed. 2d 147, 93 S. Ct. 705 (1973), as it "made no attempt to comply with Roe." Guam Soc'y of Obstetricians & Gynecologists v. Ada, 962 F.2d 1366, 1371 (9th Cir. 1991), cert. denied, 506 U.S. 1011, 121 L. Ed. 2d 564, 113 S. Ct. 633 (1992). "With two narrow exceptions, [the law] simply negated the rights and interests of the pregnant woman and forbade her to terminate her pregnancy from the moment of conception. It is difficult to imagine a more direct violation of Roe." Id. at 1372.
 
 
 68
 Even before final passage, GSOBGYN had organized a legal challenge and hired Anita P. Arriola and the firm of Arriola Cowan & Bordallo (AC&B) as its counsel.[5] Plaintiffs filed their complaint four days after the law went into effect and easily obtained a temporary restraining order, which was then turned into a preliminary injunction. R.T. 3-26-90, CR 18, at 6.
 
 
 69
 Other than the law's validity, the case presented only two substantive questions: Does the Due Process Clause apply to Guam at all? And, could Governor Ada be enjoined from enforcing the law, either in his official or individual capacity?[6]
 
 
 70
 The district court certainly had no difficulty with this case: "After the emotionalism and stridency of the opposing views are stripped away, the strict legal issue before the court is not one difficult of resolution: Is Roe v. Wade the law in the Territory of Guam?" Guam Soc'y of Obstetricians & Gynecologists v. Ada, 776 F. Supp. 1422, 1426 (D. Guam 1990). The court did not conceal its disdain for defendants' arguments, describing one as "unusual" and noting that it had "no known precedent in American jurisprudential history." Id. at 1427. Defendants appealed and we easily affirmed, holding that "it would be both wrong and presumptuous of us now to declare that Roe v. Wade is dead." 962 F.2d at 1373.
 
 
 71
 To call this an easy victory is an understatement; it was a rout. The outcome in our court and the district court was preordained. Defendants' only hope lay in persuading the Supreme Court to grant certiorari and overrule Roe. The Court, however, declined, 113 S. Ct. 633 (1992), and that was that.
 
 The Fee Application
 
 72
 Flush with success, plaintiffs presented a fee application not remarkable for its modesty. Although Arriola, then an associate with eight years' experience, was billing clients $120 per hour, she asked for an hourly fee of $175. First Fee Applic. at 3, 12. She also asked for a multiplier of two, to reflect the contingent nature of the litigation and the fact that this was, in her view, an undesirable case. Id. at 2. The ACLU, counsel for Laurie Konwith & Guam Nurses Association (GNA), the remaining plaintiffs, asked for rates charged by New York City law firms; they too requested a multiplier. Heller Decl.; Second Decl. at 2.
 
 
 73
 The district court approved every single hour billed by plaintiffs' counsel; awarded Arriola the enhanced hourly rate and the multiplier she requested; and gave the ACLU an award based on New York City rates. Decision and Order re Award of Att'y Fees (First Fee Award), CR 310.
 
 
 74
 Guam appealed and we reversed, citing Burlington v. Dague, 505 U.S. 557, 120 L. Ed. 2d 449, 112 S. Ct. 2638 (1992), Gates v. Deukmejian, 987 F.2d 1392 (9th Cir. 1992), and Davis v. City and County of San Francisco, 976 F.2d 1536 (9th Cir. 1992), vacated in part on other grounds, 984 F.2d 345 (9th Cir. 1993), which held that contingency is not properly considered when calculating the hourly rate or granting a multiplier. Guam Soc'y of Obstetricians & Gynecologists v. Ada, Nos. 91-16910 & 92-15064, 1993 WL 337544 (9th Cir. Oct. 8, 1993) (mem.). "The district court erred," we said, "by considering the risk that counsel would not be paid for their services when it set the hourly rates upon which it calculated the . . . lodestar of AC & B." Id. at ** 1.
 
 
 75
 On remand, the district court reinstated the fee award in full - and then some.[7] While admitting that the contingency fee arrangement "did factor into the court's first decision," it nevertheless held that the enhanced hourly rates and the multiplier were justified in their entirety by other "more important" considerations, such as "the extreme undesirability of the case, the likelihood that no other attorney on island would have accepted the case, and the rare and exceptional nature of the case." Second Fee Award at 6.
 
 The Standard of Review
 
 76
 An award of attorney's fees under a fee-shifting statute isn't a prize to the winning lawyer. Rather, it compensates the prevailing party for legal fees prudently incurred. Normally this consists of a reasonable hourly rate, multiplied by a reasonable number of hours (the lodestar). There is a "strong presumption" that an attorney's fee award may not exceed this figure. Pennsylvania v. Delaware Valley Citizens' Council for Clean Air, 483 U.S. 711, 728, 97 L. Ed. 2d 585, 107 S. Ct. 3078 (1987). On rare occasions, a court may grant a multiplier to account for factors not adequately reflected in the lodestar. Blum v. Stenson, 465 U.S. 886, 896-97, 79 L. Ed. 2d 891, 104 S. Ct. 1541 (1984). Whether a multiplier is available in these circumstances at all after Dague is in doubt. See pp. 14602-07 infra. What is clear is that, if a multiplier is employed, it may not be based on the fact that the attorney's recovery is contingent. Gates, 987 F.2d at 1403.
 
 
 77
 While we owe much deference to the district Judge, we are not a big rubber stamp. We have the record and can make informed judgments about all the key issues. When the district court's findings are illusory, we may not affirm; when the district court abused its discretion, we may not affirm; when the district court failed to adequately explain its reasons, we may not affirm. Where, as here, the district court made every one of these errors, we must reverse.
 
 The Number of Hours[8]
 
 78
 Because this case left little room for legitimate differences of opinion, the district court's "findings" about the "novelty and difficulty of the questions presented" and "the particularized skill necessary to address the constitutional issues presented," First Fee Award at 6-7, are contradicted by the record. The case, moreover, raised only legal issues: Was the Guam abortion statute consistent with Roe v. Wade ? Is the governor of Guam a "person" under 42 U.S.C. 1983? Does the Mink Amendment extend the Due Process Clause, as now interpreted, to Guam?
 
 
 79
 Nevertheless, plaintiffs spent much time on discovery. They noticed the depositions of Governor Joseph F. Ada;[9] June S. Mair, a legislative staffer to the senator who had sponsored the abortion statute;[10] and Police Chief Adolf P. Sgambelluri.[11] They also sought and obtained such items as drafts of the abortion bills; memos from the attorney general to the police chief; crime statistics; memos from the police chief to his staff; and copies of the governor's speeches. See Dep. of Joseph F. Ada (Ada Dep.), CR 254; Dep. of June S. Mair (Mair Dep.), CR 187; Dep. of Adolph P. Sgambelluri (Sgambelluri Dep.), CR 188; First Fee Applic., Ex. C. The discovery effort spawned a good bit of satellite litigation. For example, the parties disagreed about whether Governor Ada could be deposed. The matter was briefed and argued and, in an inexplicable ruling, the district court permitted the deposition.[12]
 
 
 80
 None of the discovery was remotely germane to the purely legal issues presented. The questions at the depositions ranged from the irrelevant to the inappropriate.[13] No plaintiff paying legal fees out of his own pocket would have authorized such frolics and detours - unless it was for the purpose of harassing the other side. But this was a case where victory was assured so plaintiffs expected to pay nothing. Spending someone else's money is always much easier than spending one's own, but our job - and the district court's - is to compensate plaintiffs only for legal fees reasonably incurred. The hours spent on discovery were not reasonably incurred; I would exclude them from the calculation of the lodestar.[14]
 
 
 81
 Plaintiffs also spent an inordinate amount of lawyer time preparing their summary judgment motion. The motion, with its 32 supporting declarations, is a wondrous thing to behold: It takes up three volumes of the record and fills 370 pages - the motion alone is 97 pages of interminable prose - and wades into such dubiously germane areas as the likely effects of the abortion statute on unwanted children,[15] doctors,[16] teenagers,[17] and nurses;[18] the practice of abortion in Guam over the ages;[19] absence of public support for the abortion statute;[20] the effects of the anti-abortion policy of Nicolae Ceausescu of Romania;[21] multiple personal testimonials to the benefits of abortion;[22] the subjugation of women on Guam;[23] and herbal and "traditional" methods of inducing abortion.[24] Most of the materials in the motion and its attachments are poignant and heartfelt, but of no conceivable relevance. Plaintiffs' summary judgment motion reads far more like a legislative record than a brief in a court of law.[25]
 
 
 82
 Contrast this Dickensian tome with the crisp, elegant opinion letter from Attorney General Elizabeth Barrett-Anderson which, in eight no-nonsense paragraphs, tells precisely why the bills that eventually became the Guam abortion statute could not possibly be constitutional. The letter says all that could reasonably be said on the subject. It accurately foreshadows the ruling of the district court and our own merits opinion. It is an elegant piece of legal craftsmanship, proving once again that there's no substitute for well-honed professional judgment.[26]
 
 
 83
 According to their records, plaintiffs' attorneys spent just short of 700 hours preparing the summary judgment motion and the reply. First Fee Applic.; Second Decl. & Exs.; Decl. of Joaquin C. Arriola, CR 263; Decl. of Mark E. Cowan, CR 264. Was this time reasonably necessary? Surely not. It was an excess, vastly out of proportion to the problem presented. Whether this was born of inexperience or an abundance of caution, the fact remains that the great majority of these materials had no bearing on the outcome of the case and are in no way reflected in our opinion or the district court's ruling. Plaintiffs were free to spend the time, of course, but not at defendants' expense.[27]
 
 
 84
 It is to forestall such gorging at the litigation trough that the Supreme Court requires district courts to "provide a concise but clear explanation of [their] reasons for [a] fee award." Hensley v. Eckerhart, 461 U.S. 424, 437, 76 L. Ed. 2d 40, 103 S. Ct. 1933. We have interpreted this as requiring "something more than a bald, unsupported amount." 977 F.2d 1300 at 1306. Elsewhere it's been said that the district court "has to make a judgment . . . in a reasoned (though brief) opinion - on what the case should have cost the party who submitted the request." Heiar v. Crawford County, Wis., 746 F.2d 1190, 1204 (7th Cir. 1984), cert. denied, 472 U.S. 1027, 87 L. Ed. 2d 631, 105 S. Ct. 3500 (1985).
 
 
 85
 In Neft v. Vidmark, Inc., 923 F.2d 746 (9th Cir. 1991), we noted that "plaintiffs did not file any opposition" to the fee application and the district court had simply approved the prevailing party's request in full. Id. at 746. We reversed with following instructions:
 
 
 86
 Although the district court considered an itemized list of services performed by defendants' counsel, . . . the court simply stated that it found 'the amount claimed to be reasonable' and awarded that amount. The court did not articulate any reasons why it found the amount reasonable, and thus gave this court no basis for determining whether or not the district court abused its discretion. Upon reconsideration, the district court must provide 'a concise but clear explanation of its reasons for the fee award.'"
 
 
 87
 Id. at 747 n.1 (collecting cases) (emphasis added).
 
 
 88
 How did the district Judge's explanation measure up to this standard? Here is everything he disclosed about his thinking in the matter:
 
 
 89
 The Court has carefully reviewed the documentation of hours supplied by plaintiffs in support of their request for attorney fees and finds that the 1,487.26 hours claimed by plaintiffs were reasonably and necessarily spent by plaintiffs in their prosecution of this lawsuit and that plaintiffs' attorneys exercised appropriate billing judgment, given the novelty and difficulty of the questions presented by Guam's status as a territory, the extreme time limitations imposed by the circumstances, the particularized skill necessary to address the constitutional issues presented, and the experience of the attorneys involved.
 
 
 90
 First Fee Award at 6-7 (footnotes omitted).[28]
 
 
 91
 The majority seems satisfied with this explanation, but does it tell us anything useful? Does it reflect the careful review of the record the Supreme Court's and our cases demand? All the district Judge says is that it was reasonable for plaintiffs to spend nearly 1,500 hours on the case, but he does not tell us why this is so. Was it reasonable or necessary for counsel to engage in discovery? Was it reasonable to file an elephantine summary judgment motion? Was it reasonable to spend time deposing the governor, the chief of police, or a legislative staffer? Was it reasonable to inflict upon opposing counsel and the court the burden of reading dozens of affidavits having nothing to do with the issues in this case?
 
 
 92
 These are the questions the district court fails to address. Yet without answers to these questions - good persuasive answers - I don't see how we can affirm the district court's determination that the hours spent by plaintiffs' counsel were reasonable. The majority's ruling conflicts with Neft.
 
 The Hourly Rate
 
 93
 The number of hours and the hourly rate play off against each other. Experienced lawyers are entitled to a higher rate in part because they can accomplish more in less time. Conversely, where lawyers spend more time than expected, this calls for a lower hourly rate as it shows inexperience or lack of professional competence. For the reasons I explain above, the number of hours spent by plaintiffs' counsel is, by any reasonable standard, way out of proportion to the difficulty of the case. If my colleagues are unwilling to reduce the number of hours by recalculating the lodestar, they must nevertheless consider counsel's inefficiency when determining the appropriate hourly rate.
 
 
 94
 Arriola introduced evidence that, during the bulk of the litigation, she was an associate at her firm and that her time was billed at $120 per hour. First Fee Applic. at 12. The fee agreement with GSOBGYN provided that the firm would be paid "at least $120 [per hour]" for her work. First Fee Award at 8. Based on plaintiffs' showing, the district court found that associates with Arriola's years of experience were billed at rates ranging from $100 to $150 per hour. Id. at 9.
 
 
 95
 Defendants too presented evidence concerning prevailing rates. Attorney General Barrett-Anderson submitted a declaration stating that attorney Monessa G. Lujan was retained as special counsel to represent the governor in this litigation at a rate of $125 per hour. Another attorney, Patrick Wolff, was hired to represent one of the defendants for $100 per hour. The attorney general also noted that, from time to time, she has retained Julia Taylor, a lawyer with nine years' experience, for $75 per hour, and Tom Evans, with 20 years' experience, for $125 per hour. Decl. of Elizabeth Barrett-Anderson re Pls.' Application for Att'ys Fees and Costs (Barrett-Anderson Decl.), CR 288, at 2.
 
 
 96
 A declaration was also submitted by Linda Ingles, a lawyer unrelated to any of the parties. As of February 1991, Ingles had been in private practice in Guam for nine years, prior to which she served as a law clerk for the Superior Court of Guam and worked for the Public Defender Service Corporation for approximately two and one-half years, totaling more than 12 years' experience. Ingles charges $150 per hour for normal litigation work. Ingles, like Arriola, has been involved in class action litigation, specifically litigation involving damages from asbestos. Ingles also notes that, on occasion, she retains another lawyer, Ruth Hall, "who specializes in appellate work and legal writing." Hall has been on island since 1977; she served as a law clerk to Judge Weeks and worked for the public defender before entering private practice. "She is considered one of the best legal writers on Guam having had extensive experience in trial and appellate briefing," Ingles tells us. Hall's hourly rate at all relevant times: $100 per hour. Decl. of Linda Ingles re Pls.' Applic. for Att'ys Fees and Costs, CR 289.
 
 
 97
 The record thus shows that lawyers of Arriola's experience - and some with more experience - bill at $150 per hour or less, sometimes considerably less. Arriola herself billed her paying clients $120 as an associate; even as a partner, she charges only $160. Supp. Decl. at 1. How then does the district court justify an hourly rate of $175? By noting that this case was brought as a class action and "there is no other attorney on Guam who possesses Ms. Arriola's combination of skill and experience in handling class action civil rights lawsuits of this size and complexity." First Fee Award at 20.
 
 
 98
 The majority does not rely on this justification, and for a good reason: It makes no sense in the context of this case. It is true that the case was brought as a class action, but it could just as well have been brought as an individual action. The relief obtained - invalidation of the Guam abortion statute - would have been precisely the same. Indeed, counsel spent less than 14 hours on the class action aspect of the case, largely in drafting the class allegations in the complaint and preparing a motion to dispense with class notice. First Fee Applic., Ex. C.
 
 
 99
 In the end, what qualifies a lawyer for an enhanced fee award is the kind of job she does with the case before her. To merit an enhanced hourly fee - a fee larger than she and her contemporaries generally charge their clients - a lawyer must have handled the case with great expertise or great dispatch or obtained unexpected results. These are factors that neither the district court nor the majority consider. As discussed above, see pages 14600-02 supra, when these factors are considered, there is nothing in the record that justifies an hourly rate above $150, the top rate charged by lawyers of Arriola's experience.[29]
 
 The Multiplier
 
 100
 To begin with, I disagree with my colleagues that Dague ever permits a multiplier in these circumstances. Dague held that it is improper to enhance the lodestar amount under an ordinary fee-shifting statute because payment to the lawyer is contingent. 505 U.S. at 567. Such an enhancement "would likely duplicate in substantial part factors already subsumed in the lodestar." Id. at 562. In explaining its Conclusion, the Court noted that, to the extent the risk of nonpayment reflects the difficulty of establishing the merits, it "is ordinarily reflected in the lodestar - either in the higher number of hours expended to overcome the difficulty, or in the higher hourly rate of the attorney skilled and experienced enough to do so." Id. (citation omitted). "Taking account of [this factor] again through lodestar enhancement," the Court noted, "amounts to double-counting." Id. (citation omitted).
 
 
 101
 As I read this passage in Dague, any factor that is necessarily included in the calculation of the lodestar cannot also be the basis for an enhancement. Indeed, Dague went farther; it held that even factors excluded from the lodestar calculation do not always provide a basis for enhancement. Id. at 566-67. According to the district court, its reasons for granting the enhancement were as follows: (a) the case was so difficult or unusual that there were no other lawyers on Guam competent to handle it; (b) the case was so undesirable because of its controversial subject matter that no other lawyers would have been daring enough to handle it; and (c) counsel was precluded from other employment because this litigation took up all of her productive time. First Fee Award at 20.[30]
 
 
 102
 Each of these factors is already taken into account in calculating the lodestar. The first two factors - that there supposedly were no other lawyers who would or could have taken the case because of its great difficulty, or because of the undesirability of the subject matter - are naturally reflected in what a lawyer charges in taking a case. At equal hourly rates, lawyers will choose cases that are easier or have more interesting subject matter; clients with cases involving more difficult work, or less desirable subjects, have to bid higher for legal services. The third factor - that the lawyer has been precluded from accepting other employment - is also taken into account in calculating the lodestar. Much as some lawyers might prefer it be otherwise, there are only so many hours in the day that can be billed to client work. In deciding whether to accept a new case, a lawyer must consider whether it will keep him from serving other clients. As with any other pricing mechanism, the hourly rate reflects the cost of opportunities foregone.
 
 
 103
 The majority misreads Dague by considering policy questions such as whether a higher hourly rate would encourage litigation of undesirable cases. Maj. op. at 14573. Such considerations may be brought to bear only where the factors in question were not already considered in calculating the lodestar. 505 U.S. at 562. Because all the factors on which the district court relied were normal market factors that go into calculating the lodestar, they cannot form the basis of an enhancement under Dague. There is thus no room for us to make policy judgments.
 
 
 104
 Even were an enhancement based on such factors permitted, there are no grounds for an enhancement here. While I do not question the district court's statement that factors other than contingency played a role in its original decision granting the enhanced hourly rate and the multiplier, the fact remains that contingency was at the very heart of the fee applications and the affidavits supporting it.[31] Reading these materials, I find it hard to believe that contingency did not play a dispositive role in the district court's initial decision setting the rate and granting the multiplier.[32] I don't understand, then, how the enhancement can remain the same when this substantial factor is deleted. It seems odd to say that three plus one equals four, but then four minus three still equals four.
 
 
 105
 But let's assume that the contingency fee played no role at all in the district court's decision, and let's look at the other factors advanced in support of the multiplier. Essentially, the court found that there were no lawyers on Guam as competent as Arriola to handle to case, and that no other lawyers would have had the courage to do so. The court errs on both counts.[33]
 
 
 106
 No Other Lawyer Competent to Handle the Case
 
 
 107
 Insofar as the district court based its finding on the absence of other local counsel competent to handle the case, it was clearly mistaken. Experience shows there are plenty of lawyers in Guam and Saipan who could have handled this case. This remote corner of our circuit regularly gives rise to sophisticated litigation involving difficult legal questions on a wide variety of subjects. One of the most difficult legal issues I have dealt with, for example, was raised in Ngiraingas v. Sanchez, 858 F.2d 1368 (9th Cir. 1988), a case out of Guam that eventually was resolved by the Supreme Court, 495 U.S. 182 (1990). Ngiraingas was ably handled in the district court, our court, and the Supreme Court by island counsel Jeffrey R. Siegel. Ngiraingas is not unique, not by a long shot. Attached as Appendix B is a list of some of the lawyers from Guam and Saipan who, according to published reports, have handled complicated cases in the federal courts. Any of these lawyers - and probably many others - would have been perfectly capable of handling this case.
 
 
 108
 Would any of them have been willing to challenge Guam's abortion statute? There's no way of knowing, as none of them was asked. See p. 14612 infra.[34] But to say, as did the district court, that "there is no other attorney on Guam who possesses Ms. Arriola's combination of skill and experience," First Fee Award at 20, is just not true.
 
 
 109
 No Other Lawyer Courageous Enough to Handle the Case
 
 
 110
 The district court's second justification for the award of a multiplier was the "extreme undesirability" of the case, Second Fee Award at 6, arising from the fact that "Guam is a relatively small and predominantly Catholic community and . . . this lawsuit was particularly emotionally charged." First Fee Award at 19. The court also noted that Arriola received death threats during the course of the litigation, "encountered overt hostility from members of the community," id., and that, "even with the prospect of a multiplier of two, Guam attorneys asked to represent similarly unpopular plaintiffs in similarly unpopular cases will be extremely reluctant to undertake representation." Second Fee Award at 7. The majority approves, but do these reasons make sense? Are they supported by the record? Are they fair to the people and lawyers of Guam? I think not.
 
 
 111
 The district court's order paints a picture of an island community where the public is virtually of one mind on the question of abortion, and where all Dissent on the issue is quickly stifled. See First Fee Award at 19-20. The district Judge cites no evidence for this, just his own personal belief. See Second Fee Award at 7. A review of the record - to say nothing of simple common sense - contradicts the district court's assessment. As the following items illustrate, opinion in Guam as to both the legality and the wisdom of the abortion statute was mixed; many individuals and public officials opposed the law:
 
 
 112
 * The Guam Nurses Association (GNA), consisting of approximately 90 nurses on Guam, Decl. of Rita Lujan Bevacqua, CR 116, at 1, joined in this lawsuit as a party plaintiff without any registered Dissent among its members, Br. of Appellees at 30.
 
 
 113
 * The Guam Society of Obstetricians and Gynecologists, consisting of obstetricians and gynecologists on the island, Decl. of Dr. Edmund A. Griley, M.D., CR 116, at 1, joined as party plaintiffs in the lawsuit, also apparently without Dissent.
 
 
 114
 * In addition to the representatives of the plaintiffs, no fewer than 15 individuals living on island - several of them Guam government employees - filed declarations supporting plaintiffs' summary judgment motion. See Decls. of Kirk Bellis; Rev. Dr. David K. Corbin; Evangelista Doe; Manuela Doe; Brindha Muniappan; Cynthia Naval; Carol O'Donnell; Beverly Olson, R.N.; Robert F. Rogers, Ph.D.; Patricia Stahlnecker, R.N.; Linda Stark; Donald H. Rubinstein; Marilyn Wingfield; Ann Workman; and Randall L. Workman, CR 116.
 
 
 115
 * According to plaintiffs, 500 to 1,000 abortions are performed on Guam every year, Decls. of John S. Dunlop, M.D.; Edmund A. Griley, M.D.; abortions are accepted as part of Guamanian culture and have been for centuries, Decls. of Donald Rubinstein; Dr. Laura Thompson; Ann Workman; Randall L. Workman, CR 116; abortion can be reconciled with some Roman Catholic viewpoints, Decl. of Daniel C. Maguire, CR 116.
 
 
 116
 * A scientifically conducted survey of Guamanians taken in late April and early May of 1990 concluded that a plurality (40.6 percent) opposed the abortion law; only 38.1 percent supported the law. Decl. of Robert F. Rogers, Ph.D., CR 116, Ex. A.
 
 
 117
 * In a poll taken in March 1990 by a cable television company, 77 percent of those contacted said they would vote to rescind the abortion statute. Guam Judge Suspends Restrictive Abortion Law, UPI, Mar. 26, 1990, available in LEXIS, NEWS Library, ARCNWS File.
 
 
 118
 No doubt some denizens of Guam - perhaps a great many - feel strongly that abortion should be illegal. But there are strong views for and against abortion throughout the United States. Is there anything in the record supporting the view that Guamanians are less capable of civil disagreement on this issue than other U.S. citizens? Based on nothing more than the district court's personal assessment, would we uphold a similar "finding" as to the people of Los Angeles, or of Phoenix, or of the District of Oregon? Surely not. The people of Guam are entitled to no less respect.
 
 
 119
 But let's assume, contrary to fact, that Guamanians were uniformly opposed to abortion. Let's assume also that the political tides strongly favored the abortion law and that any lawyer who brought a case opposing the legislation would be subject to social and political pressure. What evidence is there that lawyers on Guam and Saipan would fail to rise to the occasion - that they would turn away clients wishing to challenge a patently unconstitutional law passed by their legislature?
 
 
 120
 Long-standing tradition imposes upon lawyers a responsibility to take on unpopular causes - even causes the lawyer personally opposes - in order to vindicate the legal rights of fellow citizens.[35] A few examples in the margin will suffice, but no doubt we can all come up with scores of others.[36] Are the lawyers of Guam and Saipan unworthy of this noble tradition? Can we really agree with the district court that "even with the prospect of a multiplier of two, Guam attorneys asked to represent similarly unpopular plaintiffs in similarly unpopular cases will be extremely reluctant to undertake representation"? Second Fee Award at 7.
 
 
 121
 All evidence is to the contrary. June S. Mair, Senator Arriola's legal counsel, advised her boss bluntly of the proposed law's likely unconstitutionality. Mair Dep. at 23. Attorney General Barrett-Anderson spoke with equal candor in a written opinion whose effect could only have been to derail the proposed legislation, see App. A, and which earned her the disapproval of Senator Arriola, Mair Dep. at 34. Guam's chief of police cautioned his force to use restraint in making arrests under the new law. Sgambelluri Dep. at 45, 51. Although the governor signed the legislation, he declared himself torn on the issue and expressed his preference for a narrower statute. Ada Dep., Ex. 2 at 1, 3. Various officials and employees of the Guam government submitted affidavits in support of plaintiffs' contentions, presumably exercising their ethical responsibilities to their respective professions. See Decl. of Kirk Bellis (Staff Psychiatrist, Guam Dept. of Mental Health); Cynthia Naval (Planner, Guam Dept. of Commerce); Beverly J. Olson, R.N. (Assistant Professor, University of Guam); Robert F. Rogers, Ph.D. (Professor, University of Guam); Patricia Stahlnecker, R.N. (School Health Counselor, Oceanview High School); Donald H. Rubinstein (Associate Professor, University of Guam); Marilyn Wingfield (Director, Guam Dept. of Mental Health), CR 116. Several lawyers submitted affidavits in support of plaintiffs' fee petition. See pp. 14612-13 infra.
 
 
 122
 In light of this evidence that professionals on Guam, just as elsewhere, are willing and able to live up to their responsibilities, what supports the district court's finding that Guam lawyers must be shown a golden carrot before they will take on unpopular cases? Remarkably little. To begin with, there is no evidence that any lawyers on Guam or Saipan were asked to handle the case and turned it down - not for reasons of undesirability, not out of moral scruples, not out of a concern that they might be in over their heads. Neither Anita Arriola nor Joaquin Arriola discuss this point in their declarations, focusing, rather, on the contingent nature of the litigation as a basis for seeking an enhancement. Decl. of Joaquin C. Arriola in Supp. of Pls.' Application for Att'ys Fees and Costs at 3-5, CR 263. Arriola's partner, Mark E. Cowan, expresses the view that, had Arriola been unwilling to take the case, "it is probable that such responsibility would have been assumed by a stateside based firm." Decl. of Mark E. Cowan in Supp. of Pls.' Application for Att'ys Fees and Costs, CR 264, at 3. However, he bases his speculation only on the perceived lack of competence of other island counsel, not on the undesirability of the case. Id.
 
 
 123
 Three other lawyers submitted declarations in support of the fee application, all of them stressing that this was a complex class-action civil rights case and the recovery was contingent. One of the attorneys, G. Patrick Civille, says nothing about undesirability. Decl. of Patrick G. Civille, CR 259. James S. Brooks points to the hostility Arriola encountered and argues that she is entitled to larger fees because of her firm's tarnished image and the personal hardship she endured. Decl. of James S. Brooks at 4, CR 260. I discuss this point below, but what is significant here is that Brooks says not a word about the unwillingness of other lawyers to handle the case under these circumstances.
 
 
 124
 Finally, there is the declaration of J. Bradley Klemm, which the district court cites. See First Fee Award at 17. Klemm makes a number of assertions in his declaration - about the difficulty of the case, about possible conflicts of interest on the island, about the risk of nonpayment. In addition, his declaration also contains the following two sentences: "Guam is a small island and is predominantly Catholic. Based on my experience and belief, many lawyers on Guam would not have accepted this case because of the position of the leadership of the Catholic Church on Guam on this issue." Decl. of J. Bradley Klemm in Support of Pls. Application for Att'ys Fees and Costs, CR 260, at 3. This is the only item in the record that even remotely supports the district court's finding that Guam lawyers would have had qualms about taking plaintiffs' case. And what exactly does Klemm say? Not that all lawyers on Guam and Saipan would have been unwilling to do so; not that most lawyers would have been unwilling; not that he knows even a single lawyer who would have refused the case on moral grounds; not even that he himself would have done so. Klemm merely expresses his personal belief, unsupported by any facts, that many lawyers would have been unwilling to handle the case. Does "many" mean five? Does it mean 10? Does it mean 25 percent of the bar? Does it mean 50 percent? Of course there's no way of knowing. Klemm, a careful attorney who is well-acquainted with his duty of candor, has made a statement that is so vague it can't be refuted. The Klemm Declaration lends little if any support to the district court's "finding" that Guamanian lawyers en masse were too intimidated to handle the case.[37]
 
 
 125
 There is, finally, the fact that Arriola suffered some form of vilification, including possibly a death threat, apparently in connection with her handling of the case. What bearing can this have on the fee question? Section 1988 is not a workers' compensation statute for lawyers; it's a means whereby a prevailing party can recover amounts it reasonably spends on a lawyer. Counsel, in turn, is paid for the services she renders, not the inconvenience or harm that happen to befall her as a result. Had these threats and vilifications occurred before counsel undertook the representation, this might have affected the hourly rate at which she and other lawyers would have been willing to take the case. But, coming after the litigation was underway, they could have had no bearing on the fee for which Arriola agreed to work.
 
 
 126
 And, while we're considering just how "undesirable" this case supposedly was, it strikes me as terribly one-sided to disregard the collateral advantages that inured to Arriola and her firm as a result of the litigation. To begin with, every lawyer and every firm enjoys a victory, particularly a victory against the established order; by that standard, this was a doozy. I rather doubt that Arriola and her firm conceal their participation when they engage in what is gingerly referred to as "client development." See Planned Parenthood of Cent. & N. Arizona v. State of Arizona, 789 F.2d 1348, 1354 (9th Cir. 1986) ("Controversial representation is just as likely to bolster the reputation of a law firm as it is to harm it.").[38]
 
 
 127
 Moreover, the cause here was one to which Arriola was not indifferent. She testified against the pending legislation and then sounded the alarm by alerting the ACLU that the Guam legislature was about to pass the country's most restrictive abortion statute. See Gross, note 5 supra. How many lawyers toiling in law firms across the country would not gladly give up their Lucite cubes and power lunches for a chance to lead the battle to preserve a fundamental right under attack? And how many spend their entire careers without once savoring a decisive victory in a cause they hold near and dear? The simple reality - the reality written all over this record - is that Arriola did not have to be coaxed into this case by fat fees; she did not have to overcome fears for her safety, or concerns about the difficulty of the case, or anything else. This is a torch she wanted to carry. She found the right clients, she contacted the national ACLU for support, she brought a lawsuit and managed to knock out a piece of legislation she considered anathema.
 
 
 128
 This is all to her credit. It is precisely what one would hope and expect lawyers will do when personal liberties come under attack in their communities. But if we are going to take into account such nebulous factors as the desirability or undesirability of the case, we must consider both sides of the coin. Despite their protestations, see note 31 supra, Arriola and the ACLU did not need to be lured into this lawsuit - they jumped in with both feet. Surely there were many lawyers on Guam and Saipan who would have been willing and able to take Arriola's place.[39] Any contrary finding by the district court flies in the teeth of the record.
 
 
 129
 * * *
 
 
 130
 I would affirm the interim fee award; not a penny more.
 
 APPENDIX A
 
 131
 Guam attorney general's opinion letter predicting unconstitutionality of legislation that became Guam abortion statute.
 
 
 132
 (SEAL)
 
 Elizabeth Barrett-Anderson
 Attorney General
 Office of the Attorney General
 Territory of Guam
 Donald L. Paillette
 Chief Deputy Attorney General
 Phone: (671) 472-6841-4
 Telefax: (671) 472-2493
 Telex: (650) 697-5352
 February 26, 1990
 Senator Pilar C. Lujan
 
 133
 Chairwoman, Committee on Judiciary and Criminal Justice
 
 Twentieth Guam Legislature
 Agana, Guam 96910
 Re: Bills # 848 and # 842
 
 134
 Dear Madam Chairwoman and Members of the Committee:
 
 
 135
 On September 16, 1989 a public hearing was held on Bill # 848, an act to ban abortions on Guam, and Bill # 842, an act to limit abortions to instances of rape and incest. Although our office was not able to prepare testimony in concert with the Governor's office in time for the public hearing, having received notice on September 14th, we respectfully request the Committee's acceptance of our written testimony on these important bills.
 
 
 136
 We all are acutely aware of the highly sensitive and volatile nature of the national public debate surrounding the question of legalized abortions. The controversy has raged unabated for years and recently intensified because of the U.S. Supreme Court's recent decision in Webster v. Reproductive Health Services. The apparently irreconcilable views expressed by "pro-life" and "pro-choice" advocates are so emotionally charged there is scant room for compromise.
 
 
 137
 It is recognized that reasonable persons can and do hold unalterably opposed opinions about legal abortions, and we fully appreciate the fact that some of those subjective personal opinions stem from religious beliefs, moral attitudes and ethical considerations. However, it is the duty of the Attorney General to examine and evaluate the proposed legislation in light of the existing law of the land, and to give you an objective legal opinion as to whether or not the bills before you can pass constitutional muster. In that regard, it's necessary to review and discuss the relevant court decisions on the subject.
 
 
 138
 Our review of Bills # 848 and # 842 focus solely on an interpretation of constitutionality. It is my opinion that Bills # 848 and # 842 are unconstitutional as violative of a woman's constitutional right of privacy as enunciated by the United States Supreme Court's 1973 decision in Roe v. Wade, 93 S. Ct. 705, 410 U.S. 113, 35 L. Ed. 2d 147 (1973). The Court stated:
 
 
 139
 "This right of privacy . . . is broad enough to encompass a woman's decision whether or not to terminate her pregnancy. The detriment that the State would impose upon the pregnant woman by denying this choice altogether is apparent . . . We therefore, conclude that the right of personal privacy includes the abortion decision . . ." (410 U.S. 155)
 
 
 140
 The right of a woman to choose to terminate her pregnancy is protected under this right of privacy. Under such guarantee no state may interfere with or regulate during the first trimester of pregnancy an attending physician's decision that the patient's pregnancy should be terminated. Further no state may regulate the abortion procedure during the second trimester of pregnancy except to the extent that the regulation is intended to protect and preserve the health of the mother or fetus. Under the Fourteenth Amendment to the United States Constitution, a state statute which proscribes all abortions after the point where a fetus has become viable, except those abortions necessary to preserve the life or health of the mother, is permissible.
 
 
 141
 The Court's ruling in Webster v. Reproductive Health Services, et al. (492 U.S. 490, 109 S. Ct. 3040, 106 L. Ed. 2d 410) has not disturbed the basic premise of Roe. In Webster the Court merely allowed states to determine whether abortions should be performed in public facilities, at public expense. The Court did nothing by way of overruling its position in Roe.
 
 
 142
 Prohibiting abortions entirely would violate the above discussed constitutional guarantees. Prohibiting abortions except in instances of pregnancies resulting from rape and incest would likewise violate the same principles. A state cannot interfere with a woman's right of personal privacy to decide to have an abortion whatever the cause of her pregnancy. The state may regulate such a decision, but it cannot deprive a woman of such a choice. Bills # 848 and # 842 would take away a woman's right to decide (usually upon consultation with her physician) to have an abortion.
 
 
 143
 In addition to those basic constitutional defects in Bill # 842, Section (4) of the bill creates further constitutional problems. Parental consent regulations have uniformly been struck down in a majority of states as unconstitutional where it attempts to broadly prohibit a minor from obtaining an abortion. ( Coe v. Gerstein, 376 F. Supp. 695; Gary Northwest Indiana Women's Services v. Bowen, 421 F. Supp. 734; Ballard v. Anderson, 4 Cal. 3d 873, 95 Cal. Rptr. 1, 484 P.2d 1345 CR 1.) However, some parental consent statutes have been upheld as constitutional where the state attempts to provide alternative procedures whereby a minor could demonstrate her maturity to make an abortion decision. ( Zbaraz v. Hartigan, 763 F.2d 1532; Re Moe, 18 Mass. App. Ct. 727, 469 N.E.2d 1312; American College of Obstetricians & Gynecologists v. Thornburgh, 737 F.2d 283.) It should be noted that the U.S. Supreme Court this term has decided to hear the consent issue on abortions for minor girls.
 
 
 144
 The Federal Constitution, as interpreted by the U.S. Supreme Court, guarantees to every woman the right to decide whether or not to have an abortion. No state can take that decision away except by regulation which is intended to promote compelling state interests in protecting the health of its citizens. Bills # 842 and # 848 attempt not to regulate, but to proscribe. For this reason we believe that both bills would be held unconstitutional.
 
 
 145
 Sincerely,
 
 
 146
 /s/
 
 ELIZABETH BARRETT-ANDERSON
 
 147
 cc: Governor
 
 All Committee Members
 APPENDIX B
 
 148
 Some attorneys practicing on Guam and Saipan (Commonwealth of the Northern Marianas or CNMI) when the case was filed. Years of experience at that time, insofar as can be determined from published sources, in parentheses.
 
 
 149
 Marybeth Herald, Saipan (14): Wabol v. Villacrusis, 908 F.2d 411 (9th Cir.), as amended, 958 F.2d 1450 (9th Cir. 1990) (Equal Protection Clause does not apply to race-based restrictions on long term alienation of CNMI land), cert. denied, 506 U.S. 1027 (1992); Aldan-Pierce v. Mafnas, 31 F.3d 756 (9th Cir. 1994) (clarifying the jurisdiction of CNMI courts after the Commonwealth Judicial Reorganization Act of 1989), cert. denied, 130 L. Ed. 2d 794, 115 S. Ct. 913 (1995).
 
 
 150
 Theodore R. Mitchell, Saipan (30): Wabol v. Villacrusis, 908 F.2d 411 (9th Cir.), as amended, 958 F.2d 1450 (9th Cir. 1990), cert. denied, 506 U.S. 1027 (1992); Aldan-Pierce v. Mafnas, 31 F.3d 756 (9th Cir. 1994), cert. denied, 130 L. Ed. 2d 794, 115 S. Ct. 913 (1995); Marianas Public Land Trust v. Government of Northern Mariana Islands, 838 F.2d 341 (9th Cir. 1988) (monies held in joint account by United States and CNMI pursuant to land acquisition agreement were not "proceeds of the Public Lands" within the meaning of the CNMI constitution); Ferreira v. Borja, 1 F.3d 960 (9th Cir. 1993) (CNMI Supreme Court had, in substance, attempted to "deprive a person a property interest through the expedient of an untenable judicial interpretation of local law that denies that a property interest ever existed").
 
 
 151
 Jay H. Sorensen, Saipan: Yokeno v. Mafnas, 973 F.2d 803 (9th Cir. 1992) (district court erred in concluding that it need not determine whether federal anti-collusion statute barred exercise of diversity jurisdiction).
 
 
 152
 Howard Trapp, Guam (36): Territory of Guam v. Olsen, 431 U.S. 195, 52 L. Ed. 2d 250, 97 S. Ct. 1774 (1977) (Guam Legislature violated the 1950 Organic Act of Guam when it divested federal district court of appellate jurisdiction over cases from Guam and transferred it to newly created Guam Supreme Court); United States v. Perez, 67 F.3d 1371 (1995) (failure to instruct jury on essential element of crime cannot be harmless error), reh'g en banc granted, 77 F.3d 1210 (1996);* Chase Manhattan Bank v. Gems-by-Gordon, 649 F.2d 710 (1981) (negative pledge agreement could not be enforced as equitable mortgage where that was not parties' intent); Awa v. Guam Memorial Hospital Authority, 726 F.2d 594 (9th Cir. 1984) (Guam statute's screening and arbitration requirement for medical malpractice suits was inconsistent with statute's right to trial by jury, rendering these provisions unenforceable as written); United States v. Villacrusis, 992 F.2d 886 (9th Cir. 1993) (federal Comprehensive Drug Abuse Prevention and Control Act of 1970 did not preempt Guam law against importing controlled substances); People of the Territory of Guam v. Marquez, 963 F.2d 1311 (9th Cir. 1992) (failure to instruct jury orally on elements of offense was structural error compelling automatic reversal); Nelson v. Ada, 878 F.2d 277 (9th Cir. 1989) (1986 Amendment to Guam's Organic Act did not ratify 1977 Guam statute that was invalid under the pre-Amendment Organic Act); United States v. Bordallo, 857 F.2d 519, (9th Cir. 1988), as amended on reh'g, 872 F.2d 334 (9th Cir.) (Guam was not a "State" for purposes of federal statute prohibiting State employees from accepting kickbacks), cert. denied, 493 U.S. 818 (1989); People of the Territory of Guam v. Yang, 850 F.2d 507 (9th Cir. 1988) (en banc) (Ninth Circuit reviews de novo the interpretation of local law by the Appellate Division of the District Court of Guam, and that the latter may not rely on unpublished Ninth Circuit decisions); United States v. Leon Guerrero, 847 F.2d 1363 (9th Cir. 1988) (interrogating agent's promise to inform the government prosecutor about a suspect's cooperation does not render the suspect's subsequent statement involuntary); Cruz v. Abbate, 812 F.2d 571 (9th Cir. 1987) (Appellate Division of the District Court of Guam has power to issue writs of mandamus under the All Writs Act); People of the Territory of Guam v. Quinata, 785 F.2d 812 (9th Cir. 1986) (filing of juvenile court petition commenced criminal proceedings for statute of limitations purposes); People of the Territory of Guam v. Mafnas, 721 F.2d 683 (9th Cir. 1983) (order denying motion to suppress was not a final decision for appealability purposes); People of the Territory of Guam v. Okada, 694 F.2d 565 (9th Cir. 1982) (Guam legislature had no power under the Organic Act of 1950 to authorize government appeals from the District Court of Guam in criminal cases), as amended, 715 F.2d 1347 (1983), cert. denied, 469 U.S. 1021 (1984); Jones & Guerrero Co. v. Sealift Pac., 650 F.2d 1072 (9th Cir. 1981) (District Court of Guam had jurisdiction under F.R.C.P. 60(b) to set aside a previous order dismissing the action); United States v. Santos, 623 F.2d 75 (9th Cir. 1980) (1958 amendment to 48 U.S.C. 1424(a) did not deprive District Court of Guam of jurisdiction to hear criminal cases).
 
 
 153
 John A. Spade, Guam (17): Casualty Assurance Risk Ins. Brokerage Co. v. Dillon, 976 F.2d 596 (9th Cir. 1992) (letters defaming a Guam-based corporation in Indiana were insufficient to create minimum contacts for in personam jurisdiction).
 
 
 154
 David A. Mair, Guam (15): Bunyan v. Camacho, 770 F.2d 773 (9th Cir. 1985) (government retirement benefit plan distinguishing between native Guamanians and immigrants violated equal protection), cert. denied, 477 U.S. 903, 91 L. Ed. 2d 562, 106 S. Ct. 3271 (1986); Esta Later Charters, Inc. v. Ignacio, 875 F.2d 234 (9th Cir. 1989) (shipowner must file petition under Limited Liability Act within six months of first claim).
 
 
 155
 Jesus U. Torres, Guam (34): Bunyan v. Camacho, 770 F.2d 773 (9th Cir. 1985), cert. denied, 477 U.S. 903, 91 L. Ed. 2d 562, 106 S. Ct. 3271 (1986).
 
 
 156
 Thomas C. Sterling, Guam (18): Gioda v. Saipan Stevedoring Co., 855 F.2d 625 (9th Cir. 1988) (statute limiting appellate jurisdiction of District Court for District of Northern Mariana Islands was inapplicable to case pending at trial when statute enacted).
 
 
 157
 J. Bradley Klemm, Guam (30): Laguana v. Guam Visitors Bureau, 725 F.2d 519 (9th Cir. 1984) (Bureau employee was not a public employee protected from patronage dismissals); Holmes v. Director of Revenue and Taxation, Gov't of Guam, 827 F.2d 1243 (9th Cir. 1987) (loss in CNMI corporation could be deducted for purposes of Guam territorial income tax); Abuan v. General Elec. Co., 3 F.3d 329 (9th Cir. 1993) (summary judgment was proper against plaintiffs seeking recovery for exposure to PCB's, where plaintiffs couldn't show they were certain to incur disease or had a significant chance of suffering a latent disease), cert. denied, 510 U.S. 1116, 114 S. Ct. 1064, 127 L. Ed. 2d 383 (1994).
 
 
 158
 Gary D. Hull, Guam (21): Bordallo v. Reyes, 763 F.2d 1098 (9th Cir. 1985) (Guam Visitor's Bureau was a government agency or instrumentality and that legislation regarding Board membership violated Organic Act).
 
 
 159
 Richard L. Johnson, Guam (15): Marx v. Government of Guam, 866 F.2d 294 (9th Cir. 1989) (Guamanian government entitled to sovereign immunity and hence immune from suit in federal court to resolve title to shipwreck in territorial waters).
 
 
 160
 Richard A. Pipes, Guam (19): Misch v. Zee Enters., 879 F.2d 628 (9th Cir. 1989) (Jones Act applies in CNMI); Sakamoto v. Duty Free Shoppers, Ltd., 764 F.2d 1285 (9th Cir. 1985) (exclusive franchise agreement didn't violate antitrust laws or equal protection principles), cert. denied, 475 U.S. 1081, 89 L. Ed. 2d 715, 106 S. Ct. 1457 (1986); Awa v. Guam Memorial Hosp. Auth., 726 F.2d 594 (9th Cir. 1984).
 
 
 161
 John E. Moore, Guam and Saipan (35): Abuan v. General Elec. Co., 3 F.3d 329 (9th Cir. 1993), cert. denied, 510 U.S. 1116, 114 S. Ct. 1064, 127 L. Ed. 2d 383; Nelson v. Ada, 878 F.2d 277 (9th Cir. 1989).
 
 
 162
 Michael W. Dotts, Saipan (9): United States ex rel. Richards v. De Leon Guerrero, 4 F.3d 749 (9th Cir. 1993) (enforcing administrative subpoena mandating release of tax records to Inspector General of the Department of the Interior).
 
 
 163
 Randell T. Fennell, Saipan (18): Camacho v. Civil Serv. Comm'n, 666 F.2d 1257 (9th Cir. 1982) (provision for appointments to Civil Service Commission violated separation of powers provision of CNMI Constitution).
 
 
 164
 Douglas F. Cushnie, Guam and Saipan (32): Fleming v. Department of Pub. Safety, 837 F.2d 401 (9th Cir.) (reversing verdict for police officer in section 1983 action), cert. denied, 488 U.S. 889, 102 L. Ed. 2d 212, 109 S. Ct. 222 (1988); Citibank N.A. v. Oxford Properties & Fin., 688 F.2d 1259 (9th Cir. 1982) (after district court reinstated first claim, it erred in reaching other claims dependent on trial of the first); Gioda v. Saipan Stevedoring Co., 855 F.2d 625 (9th Cir. 1988); Temengil v. Trust Territory of the Pacific Islands, 881 F.2d 647 (9th Cir. 1989) (class action employment discrimination suit involving application of civil rights statutes to trust territory government, private rights of action under Trusteeship Agreement and Trust Territory Code, and United States sovereign immunity), cert. denied, 496 U.S. 925, 110 L. Ed. 2d 638, 110 S. Ct. 2617 (1990); Gushi Bros. Co. v. Bank of Guam, 28 F.3d 1535 (9th Cir. 1994) (antitying provisions of Bank Holding Company Act were not applicable to transaction occurring entirely within Republic of the Marshall Islands).
 
 
 165
 Traylor T. Mercer, Guam and Saipan (22): Diaz v. Trust Territory of the Pacific Islands, 876 F.2d 1401 (9th Cir. 1989) (reversing dismissal of class action employment discrimination suit for lack of notice); Temengil v. Trust Territory of the Pacific Islands, 881 F.2d 647 (9th Cir. 1989), cert. denied, 496 U.S. 925, 110 L. Ed. 2d 638, 110 S. Ct. 2617 (1990).
 
 
 166
 William M. Fitzgerald, Saipan (22): Commonwealth of the Northern Mariana Islands v. Atalig, 723 F.2d 682 (9th Cir.) (Northern Mariana statutory provisions governing right to jury trial did not violate Sixth or Fourteenth Amendments), cert. denied, 467 U.S. 1244, 82 L. Ed. 2d 826, 104 S. Ct. 3518 (1984); Sakamoto v. Duty Free Shoppers, Ltd., 764 F.2d 1285 (9th Cir. 1985), cert. denied, 475 U.S. 1081, 89 L. Ed. 2d 715, 106 S. Ct. 1457 (1986).
 
 
 167
 Paul A. Lawlor, Guam (22): Guam Fresh, Inc. v. Ada, 849 F.2d 436 (9th Cir. 1988) (determining whether Guam's laws regarding inspection of imported agricultural products is preempted by the Plant Quarantine Act of 1912).
 
 
 168
 David W. Dooley, Guam and Saipan (20): Brown v. Civil Serv. Comm'n, 818 F.2d 706 (9th Cir. 1987) (provision of Guam's Organic Act requiring governor to provide adequate public education system doesn't give governor authority over school system exclusive of concurrent legislative authority); Guam v. Superior Court, 998 F.2d 754 (9th Cir. 1993) (federal district court had exclusive jurisdiction of issue arising in territorial tax rebate claim).
 
 
 169
 Donald C. Williams, Saipan (now in Los Angeles) (29): Mafnas v. Superior Court, 936 F.2d 1068 (9th Cir. 1991) (federal question jurisdiction existed to clarify the relationship between the CNMI and the Appellate Division of the District Court for the Northern Mariana Islands).
 
 
 170
 Michael A. White, Saipan (27): DeMesa v. Castro, 844 F.2d 642 (9th Cir. 1988) (United States was not entitled to conduct de novo and independent investigation in class action lawsuit by former Filipino citizens seeking certificates of identity as citizens of CNMI).
 
 
 171
 G. Patrick Civille, Guam and Saipan (19): Cassidy v. Tenorio, 856 F.2d 1412 (9th Cir. 1988) (defendant's allegations of fraud and undue influence were not sufficient to set aside judgment on promissory notes).
 
 
 172
 Jeffrey R. Siegel, Guam: Cassidy v. Tenorio, 856 F.2d 1412 (9th Cir. 1988); United States v. Cruz, 783 F.2d 1470 (9th Cir.) (entrapment instruction was proper where it permitted jury to find that later drug sales were independent of alleged initial inducement), cert. denied, 476 U.S. 1174, 90 L. Ed. 2d 987, 106 S. Ct. 2902 (1986).
 
 
 
 [1]
 Specifically, the hourly rates applied by the district court for the AC&B attorneys were as follows: Joaquin Arriola - $200.00; Mark Cowan - $195.00; Anita Arriola - $175.00. The hourly rate applied for the local ACLU lawyer, Carl Varady, was $150.00
 
 
 [2]
 Those hourly rates were as follows: Lynn Paltrow - $241.00; Rachel Pine - $241.00; Simon Heller - $25.00 (for services which could have been performed by someone of less skill and knowledge) and $135.00; Louise Melling - $135.00; Ellen Goetz - $100.00; and Andrew Dwyer - $80.00
 
 
 [3]
 As our colleague has so aptly stated in the past:
 Appellate Judges should be aware of their limitations. They can guide and review, but they cannot run the show. United States v. Balough, 820 F.2d 1485, 1491 (9th Cir. 1987) (Kozinski, J., Concurring).
 
 
 [4]
 In its Appendix B, the Dissent, going to great lengths in an attempt to prove this point, lists other Guam and Saipan attorneys who might be competent to handle this type of case. In doing so, the Dissent winds up proving the solid basis for the district court's finding: none of these lawyers came forward to say they would have taken this case and at least one of them (J. Bradley Klemm) submitted an affidavit stating that most local firms would be unlikely to take on such a case. Infra. at 14605 n.31
 
 
 [5]
 Courts outside the Ninth Circuit have also recognized that enhancement for factors other than contingency may still be appropriate after Dague. See, e.g., Grant v. Martinez, 973 F.2d 96, 100 (2nd Cir. 1992) (recognizing a "strong presumption" that lodestar represents a reasonable fee, but noting that other considerations may lead to upward or downward departure from lodestar), cert. denied, 113 S. Ct. 978 (1993); Shipes v. Trinity Industries, 987 F.2d 311, 323 (5th Cir. 1993) (recognizing that enhancement for results obtained may be warranted), cert. denied, 510 U.S. 991, 114 S. Ct. 548, 126 L. Ed. 2d 450 (1993); Velazquez Hernandez v. Morales, 810 F. Supp. 25, 28 (D.P.R. 1992) (in exceptional case, court may still upwardly adjust lodestar based upon factors other than contingency)
 
 
 [6]
 A careful reader could not possibly believe we intend to suggest "that the people of Guam cannot tolerate a diversity of view on the question of abortion." What the evidence demonstrates, and what we intend to convey, is that there exists on Guam a strong and vocal anti-abortion community
 
 
 [7]
 The nature of the threat to Ms. Arriola's life is quite clear from the record. According to Ms. Arriola's affidavit, at a pro-choice rally on March 26, 1990, individuals in two low rider pickup trucks yelled that they had her number and that they were going to shoot her. C.R. 132, p. 3. Two police officers at the rally told her she should report the incident to the Chief of Police and that the Guam Police Department takes such threats seriously. Apparently it does, for after reporting the incident, officers patrolled her residence every hour on the hour and her office was patrolled regularly as well
 
 
 [8]
 It is important to note that two of plaintiffs' affiants were too afraid to use their real names
 
 
 [9]
 Delia O'Hara, Abortion: MDs Who Do Them and Those Who Won't, American Medical News, February 8, 1989, at 13
 
 
 [10]
 Although a reading of the Dissent would suggest an inordinate amount of time spent on depositions, defendants themselves admit that of the six depositions taken, all but one were less than two hours long
 
 
 [11]
 In fact, in its original opposition to the fee application, defendants directly challenged only 43.3 of the approximately 1500 hours spent by counsel, of which 2.3 hours were AC&B's hours
 
 
 [12]
 We note that two experienced attorneys who submitted affidavits on plaintiffs' behalf stated that they believed this litigation involved complex issues
 
 
 [13]
 The Dissent's position is interesting in light of Blackburn v. Goettel-Blanton, 898 F.2d 95 (9th Cir. 1990), in which we upheld as reasonable an attorney's fee award of over $61,000 in a $6000 breach of contract action. The Dissent, writing for the majority in that case, rejected the logic of the defendant's argument that because "the case was so simple - her breach of contract so self-evident - that plaintiffs could not have legitimately amassed" such fees. Id. at 97. Acknowledging that it often costs more than $6000 to hire an attorney to draft a complaint, we concluded that the award was justified, despite noting that the plaintiffs "sought extensive (and expensive) discovery" and "filed repeated motions to compel discovery and for sanctions." Id
 
 
 [14]
 In Webster v. Reproductive Health Services, 492 U.S. 490, 106 L. Ed. 2d 410, 109 S. Ct. 3040 (1989), the appellant and the United States as amici urged the Supreme Court to overrule Roe v. Wade, 410 U.S. 113, 35 L. Ed. 2d 147, 93 S. Ct. 705 (1973). The Court declined to do so because of the factual difference between the cases. While Roe involved a Texas statute criminalizing all abortions except when the mother's life was at stake, the statute at issue in Webster only outlawed abortions of viable fetuses. Roe had recognized a right to an abortion derived from the due process clause, but noted that this right is not absolute and at a particular point in time must yield to the state's interest in safeguarding health, maintaining medical standards and protecting life. Therefore, it was not necessary to overrule Roe 's holding that there is a right to abortion derived from the due process clause in order to determine that the state can prohibit abortions after a fetus is viable. Importantly, however, the Court left open the possibility that Roe would be overruled in the future. Besides the plurality's subtle suggestion that it would consider overruling Roe if presented with a more factually similar case, Justice Scalia in his concurrence specifically expressly advocated overruling Roe. Moreover, Justices Blackmun, Brennan and Marshall lamented:
 The plurality and Justice SCALIA would overrule Roe (the first silently, the other explicitly) and would return to the states virtually unfettered authority to control the quintessentially intimate, personal, and life-directing decision whether to carry a fetus to term. Although today, no less than yesterday, the Constitution and the decisions of this Court prohibit a State from enacting laws that inhibit women from the meaningful exercise of that right, a plurality of this Court implicitly invites every state legislature to enact more and more restrictive abortion regulations in order to provoke more and more test cases, in the hope that at sometime down the line the Court will return the law of procreative freedom to the severe limitations that generally prevailed before January 22, 1973. 492 U.S. at 537-38 (Blackmun, J., Dissenting).
 
 
 [15]
 Decl. of Douglas Eaton, M.D. and Thomas J. Yetman, M.D., CR 169, Ex. C and I
 
 
 [16]
 Decl. of Douglas Eaton, M.D., CR 169, Ex. C
 
 
 [17]
 Decl. of Rosa Salas Palomo, CR 169, Ex. E
 
 
 [18]
 Decl. of Thomas Yetman, M.D., CR 169, Ex. I
 
 
 [19]
 Delia O'Hara, Abortion: MDS Who Do Them and Those Who Won't, American Medical News, February 8, 1989, at 13
 
 
 [20]
 Defendants admit as much. See Reply Brief at 8 n. 1 (acknowledging that whether Father Cole has standing is irrelevant to the award of attorneys' fees for the work performed by AC&B because the other plaintiffs represented by AC&B clearly had standing)
 
 
 [21]
 Suter held that the Adoption Assistance and Child Welfare Act does not create rights enforceable in an action under 1983 and does not create an implied private cause of action. It said nothing about the meaning of "person" under 1983, or whether territorial officials may be sued for injunctive relief under 1983
 
 
 [1]
 R.T. 3-26-90, CR 18, at 7
 
 
 [2]
 Mem. of P. & A. in Supp. of Pls.' Mot. for Summ. J. and Perm. Inj., CR 120, at 18 (quoting Decl. of R. Rogers, Ex. A)
 
 
 [3]
 While this case arose in Guam, the two islands are only about as far apart as Los Angeles and San Diego - about 40 minutes by air. Lawyers from one jurisdiction regularly practice in the courts of the other and even the district Judge in this case is domiciled in Saipan
 
 
 [4]
 Decl. of Simon Heller (Heller Decl.), CR 275, Ex. A, at ii-iii
 
 
 [5]
 Decl. of Anita P. Arriola in Supp. of Pls.' Application for Att'ys Fees and Costs (First Fee Applic.), CR 258, Ex. C, at 1. In fact, it appears to have been Arriola herself who organized the challenge and alerted the national office of the ACLU. Jane Gross, Guam Approves Bill Posing Challenge to Abortion Ruling, N.Y. Times, March 16, 1990, at A1
 
 
 [6]
 Neither question was very hard; our opinion gives them short shrift. 962 F.2d at 1370-71. The first, we held, was readily answered by the 1968 Mink Amendment which "expressly extends to Guam the Due Process Clause of the Fourteenth Amendment, upon which the holding of Roe was founded." 962 F.2d at 1370. We recognized that "the Supreme Court requires a clear indication of congressional intent before interpreting a congressional action as extending a right to the people of Guam," id., but we disposed of this argument in two sentences: "We can scarcely imagine . . . . any clearer indication of intent than the language of the Mink Amendment: the relevant constitutional amendments 'have the same force and effect' in Guam as in a state of the United States. There is no need, therefore, to go further." Id. The second question was quite the chestnut by comparison, requiring four full paragraphs to resolve. Id. at 1371. We pointed out that section 1983 applies to persons acting under color of law of "any State or Territory"; and while territories, like states, aren't "persons" under section 1983, under well-settled law, suits against officials acting in their official capacities aren't suits against the state
 
 
 [7]
 The second fee award exceeded the first by $7,615.80. Compare First Fee Award at 21-22 with Second Fee Award at 7-9. The difference covered time and costs spent largely on preparing the second fee application. See Decl. of Anita P. Arriola in Support of Mem. on Remand, CR 332, Ex. G. Defendants were thus penalized for winning in the first fee appeal. Since we held that the district court had erred in approving the first fee award, I can see no justification for charging defendants for preparing the first (erroneous) fee application and then again for its successor
 
 
 [8]
 The majority refuses to consider the time plaintiffs' counsel spent on the litigation based on the quaint notion that the "reasonableness of the number of hours was irrelevant to the district court upon remand and irrelevant to us on appeal because defendants do not challenge the number of hours for which plaintiffs request fees and we do not generally consider arguments not raised by the parties." Maj. op. at 14574 (footnote omitted)
 But we have held that the district court must satisfy itself that the hours billed are reasonable, and articulate its reasons for its finding, even without an objection. Neft v. Vidmark, Inc., 923 F.2d 746, 747 n.1 (9th Cir. 1991). Moreover, without knowing how many hours were reasonably spent on the project, how can we figure out the lodestar, which is the reasonable number of hours times the hourly rate? And, without the lodestar, how can we figure out whether Arriola is entitled to an enhanced rate and multiplier?
 
 
 [9]
 CR 34
 
 
 [10]
 CR 31
 
 
 [11]
 CR 99
 
 
 [12]
 The district court allowed the governor to be deposed "on all actual issues, including those relating to his decision-making process in signing into law Public Law 20-134." Order Den. Mot. for Protect. Order (Den. of Prot.), CR 38, at 5. The district court's ruling was premised on the theory that Wallace v. Jaffree, 472 U.S. 38, 86 L. Ed. 2d 29, 105 S. Ct. 2479 (1985), calls for an inquiry into the subjective motivations of all those involved in passing legislation challenged on Establishment Clause grounds: "If plaintiffs' allegations are correct, Governor Ada's motivation in signing Public Law 20-134 could reasonably lead to the discovery of admissible evidence and is, therefore, relevant." Den. of Prot. at 3
 Under the district court's ruling the President, all governors, all members of Congress, all state legislators and all officials involved in the legislative process at the local level would be subject to an inquiry about their motives for signing onto legislation challenged under the Establishment Clause. I rather doubt this is what the Supreme Court had in mind when it decided Wallace ; I am aware of no other court which has permitted such an inquiry. Two other aspects of the district court's ruling are alarming. First, the court held that "Governor Ada's publication of his elaborate decision-making process acted to waive whatever claim of privilege Governor Ada may otherwise have invoked." Den. of Prot. at 4. But it is quite common for an executive to explain his reasons for signing particular legislation, see, e.g., William J. Clinton, Statement on Signing the Farm Credit System Reform Act of 1996, 32 Weekly Compilation of Presidential Documents 237, 259-260 (1996). It is equally common for legislators to explain their reasons for supporting legislation, by way of statements made on the floor, during committee hearings or in committee reports. I have much difficulty figuring out how activities we have come to accept as a standard part of the legislative process do not, under the district court's rationale, become a wholesale waiver of executive and legislative privilege. Finally, the district court held that, even if not waived, the privilege was outweighed by the plaintiffs' great need for the testimony. If plaintiffs' "need" for the testimony was great enough to outweigh a claim of privilege where plaintiffs already had a slam-dunk winner under Roe v. Wade, I can't imagine a case challenging a statute under the Establishment Clause where executive privilege would not be set aside. While we have had no occasion to review this ruling on the merits, we must surely consider it in judging whether plaintiffs' expenditure of legal fees was appropriate. That Arriola was able to lead the district court so deeply into error may be a tribute to her persuasive powers, but it does not make her expenditure of resources for that purpose prudent or justified.
 
 
 [13]
 Governor Ada, for example, was asked:
 You have never served as an altar boy or in a choir? [Ada Dep. at 3.] Have you ever before signed a bill into law where you were advised by the Attorney General or any other person that the bill was unconstitutional? [ Id. at 7.] Are you aware that different religions have different beliefs about abortion? [ Id. at 10.] Did you attend the mass at the Agana Cathedral just prior to [the pro-life] rally [held at the Governor's office just after he signed the bill]? [ Id. at 16.] June Mair, assistant to Senator Arriola, was asked: Do you know whether the Senator ever read [ Roe v. Wade ]? [Mair Dep. at 14.] Has [the Senator] ever discussed with you how she . . . obtained [her] belief [that life begins at conception]? [ Id. at 16.] But you specifically told [the Senator] that Webster [v. Reproductive Health Servs., 492 U.S. 490, 106 L. Ed. 2d 410, 109 S. Ct. 3040 (1989)] did not overrule Roe versus Wade ? [ Id. at 19.] Can you tell me who the majority of [the Senator's] colleagues are who believe [ Roe v. Wade is error]? [ Id. at 21.] What were the contents of your Discussion [with Senator Arriola about the attorney general's opinion letter]? [ Id. at 34.] Did you or Senator Arriola ever receive any other legal opinion about Bill 848 apart from the Attorney General's opinion? [ Id. at 35.] Adolph Sgambelluri, Chief of Police, was asked: If the Community of Guam wanted you or insisted that you enforce Public Law 20-134, would you devote any funding or resources to putting in hidden cameras in clinics and doctors' offices to try to find out if any doctors are performing illegal abortions? [Sgambelluri Dep. at 39.] Do you know what the breakdown is between males and females [in the Guam Police Department]? [ Id. at 5.] Chief, does the Guam Police Department have sufficient resources, including police officers and funding, to enforce all of the laws of Guam that are already on the books, excluding Public Law 20-134? [ Id. at 11.] Do you know whether the [women's prison], at the time that you were at [the Department of Corrections], had any rules or regulations allowing women prisoners at the detention facility to breast feed their children? [Id. at 16-17.]
 
 
 [14]
 My colleagues graciously cite my opinions, but, unfortunately, they sometimes miss the point. For example, Blackburn v. Goettel-Blanton, 898 F.2d 95 (9th Cir. 1990), cited by the majority at 14574 n.13, was not a case, where plaintiffs had a single objective and went about achieving it eight different ways. The whole point of Blackburn was that plaintiffs tried to parlay a six thousand dollar contract claim into something much more lucrative by means of various exotic legal theories
 At least they didn't spell my name Kaczynsky.
 
 
 [15]
 Decl. of Henry P. David, Ph.D., CR 116, Ex. G. Dr. David cites a study showing that "children born to mothers who had sought and been denied abortions tended, as young adults, to be more dissatisfied with the general development of their lives, their partner relationships, and personal friendships than the control group." Id. at 4-5. The point seems to be that these children would have been spared all these troubles had they not been born
 
 
 [16]
 Decl. of Edmund A. Griley, M.D., CR 116, Ex. M
 
 
 [17]
 Decl. of Kirk Bellis, D.O., CR 116, Ex. B
 
 
 [18]
 Decl. of Rita Lilian Bevacqua, R.N., CR 116, Ex. E
 
 
 [19]
 Decl. of Laura Thompson, Ph.D., CR 116, Ex. Z
 
 
 [20]
 Decl. of Robert F. Rogers, Ph.D., CR 116, Ex. V
 
 
 [21]
 Decl. of Henry P. David, Ph.D., CR 116, Ex. G
 
 
 [22]
 Decls. of Evangelista Doe; Manuela Doe; Linda Stark; Marilyn Wingfield, CR 116, Exs. H, I, X, BB
 
 
 [23]
 Decl. of Cynthia Naval, CR 116, Ex. S
 
 
 [24]
 Decl. of Ann Workman, CR 116, Ex. CC
 
 
 [25]
 The majority suggests that plaintiffs' motion was just the right length, pointing to the fact that defendants "saw fit to file a 65 page response supported by 108 pages of declarations and other attachments touching on topics similar to those addressed by plaintiffs." Maj. op. at 14576. The comparison is inapt. Since plaintiffs moved for summary judgment on all fronts, defendants had no choice but to respond in kind
 
 
 [26]
 For the edification of the bar, I reproduce the attorney general's opinion letter as Appendix A
 
 
 [27]
 The majority argues that the hours spent by plaintiffs' counsel were justified because "the status of Roe was extremely tenuous" at the time. Maj. op. at 14575. This argument was not advanced by plaintiffs, nor considered by the district court; defendants have not had an opportunity to address it. Even without this input, it's clear that this is highly problematic theory on which to approve the bulk of the fee award. To begin with, it's not clear how this justifies spending the additional hours at this stage of the litigation. Since the Guam statute was clearly invalid under Roe, neither the district court nor we had any reason to pass on the other theories. And, had the Supreme Court had chosen to reconsider Roe, it is out of the question that it would also have taken up plaintiffs' other claims - especially without a ruling on them below. In the unlikely event that Roe had been overruled, plaintiffs would not have been thrown out of court; they merely would have suffered denial of summary judgment on a single claim. They would then have been entitled to litigate one or more of the other legal theories on which they rely
 Which leads to an even more basic problem. Because no one has ever examined plaintiffs' other claims, it's impossible to tell whether many of them presented plausible arguments, much less winning ones. Suffice to say that, had plaintiffs lost under Roe, their other claims, some of which are summarized by my colleagues, maj. op. at 14576, were dicey. Finally, even were we to conclude that the expenditure of legal fees on these collateral issues was appropriate to the circumstances, I question whether it is legally permissible to saddle these defendants with the burden of financing the ACLU's nationwide contingency plan in case Roe was overruled. So far as I am aware, no court anywhere has relied on this theory for approving such a massive expenditure of lawyers' fees.
 
 
 [28]
 I refer to the first fee award because in its second fee award "the court adopted and fully incorporated [in relevant part] its June 25, 1991, order awarding attorney fees and costs. . . ." Second Fee Award at 6 n.7
 
 
 [29]
 Twenty five dollars an hour may not seem like a lot, but given the excessive hours billed by Arriola (848.65), Second Fee Applic., this comes to $21,216.25. If we then consider that the district court approved (and the majority affirms) a multiplier, this is doubled to $42,432.50. As Senator Dirksen is said to have said: "Pretty soon you're talking about real money."
 
 
 [30]
 The majority disputes that the district court justified the enhanced fees, in part, because it believed Guam is lacking in lawyers with the necessary skills. Maj. op. at 14569 & n.4. Here is what the district court said: "To the best of the Court's knowledge . . . there is no other attorney on Guam who possesses Ms. Arriola's combination of skill and experience in handling class action civil rights lawsuits of this size and complexity." First Fee Award at 20. Again: "Ms. Arriola . . . was uniquely qualified on Guam to spearhead this effort as lead local counsel." First Fee Award at 9-10. And again: "The more important considerations [in justifying the rate enhancement and multiplier] were . . . the rare and exceptional nature of the case, particularly in the small island community of Guam." Second Fee Award at 6. And yet again: "The Court . . . specifically finds that by awarding [the ACLU] attorneys the prevailing market rate in the legal community in which they are based [New York City], other, similarly skilled attorneys will be induced to take their skills where they are needed but not readily available." First Fee Award at 12
 The majority also disputes that the district court enhanced the award in part because Arriola was precluded from other employment. Maj. op. at 14569 & n.4. Wrong again: "The Court is further persuaded that Ms. Arriola undoubtedly was precluded from other employment when she accepted this case. As documented above, she spent many, many hours seeing it through to its Conclusion." First Fee Award at 20.
 
 
 [31]
 In her first fee application Arriola claims that "because of the substantial risk, my firm and similar firms will generally not accept [contingent] cases unless the anticipated fee . . . will be equal to at least two to three times the value of the firm's services billed at the prevailing rate." First Fee Applic. at 18. According to Simon Heller, "The ACLU accepted its status in this case as co-counsel with Ms. Arriola on a contingency basis; without the possibility of recouping attorneys' fees . . . the ACLU, which depends on contributions and grants for its operation . . . would probably not have taken this case." Heller Decl. at 5 (emphasis added). (One must wonder at counsel's statement. The suggestion that the National ACLU's Reproductive Freedom Project would stay out of a case involving a statute that undermines the very foundations of Roe v. Wade strikes me as incredible. Indeed, counsel's assertion is quite inconsistent with the venerable practice of the ACLU, which is to defend personal liberties regardless of a client's ability to pay or the availability of other compensation. As the district court observed: "The Reproductive Freedom Project exists to participate in this type of case and needs no inducement, such as the prospect of an enhanced fee upon a successful Conclusion to the case, to become involved." First Fee Award at 17. But I digress.)
 There's much more of the same: "Local firms would be unlikely to accept a case such as GSOBGYN unless the anticipated fee, if successful, would be greater than the value of the firm's services billed at the prevailing hourly rate," stated J. Bradley Klemm; "such an award makes contingent civil rights class action cases competitive with non-contingent cases . . . ." Decl. of J. Bradley Klemm (Klemm Decl.), CR 260, at 5. "Because of the inherent uncertainties [in contingency cases] the recovery for an attorney should be at least three times that expected on an hourly basis." Decl. of James S. Brooks (Brooks Decl.), CR 261, at 2.
 
 
 [32]
 The district court's original explanation of the fee award states: "Each attorney still faces the prospect of no recovery of fees or costs." First Fee Award at 10. And: "The results obtained were exactly what they sought, but [the ACLU] still faces the possibility of recovering neither [its] fees nor [its] costs." Id. at 12. And further:
 Plaintiffs presented affidavits from local attorneys that indicate that contingent fee cases are not accepted on Guam unless the attorney or firm calculates that a successful lawsuit will recover an amount two to three times greater than would be billed a paying client for the same case. See, generally, Declarations of J. Bradley Klemm, James S. Brooks, and G. Patrick Civille, filed November 15, 1990. Mr. Klemm, in particular, averred that he could not remember in his 17 years of practice on Guam even one class action civil rights case of this magnitude. Id. at 3. He further stated that "such lawsuits are unappealing to firms on Guam due to their complexity, their unusually controversial and undesirable nature, and the lack of a history of such litigation on the island." Id. He also expressed his belief that "lawyers and law firms on Guam are reluctant to take plaintiff class action civil rights cases because they take too many years to resolve, are too expensive to litigate, and tie up a firm's resources for long periods of time.["] Id. at 4.
 Plaintiffs' counsel stated that the prospect of an upward adjustment of fees due to the risk inherent in contingent fee cases was a critical inducement in their decision to accept the case. See Declarations of Anita P. Arriola and Simon Heller, filed November 15, 1990. Id. at 17-18. And still further: "This multiplier reflects the difference in Guam's market treatment of contingent fee cases as a class, rather than the 'riskiness' of this particular case." Id. at 21.
 
 
 [33]
 As noted, the district court also mentioned the fact that plaintiffs were precluded from other employment as a basis for granting a multiplier. First Fee Award at 20. Even if this were a proper ground for an enhancement, there is no evidence of this in the record. Arriola's declaration mentions not a single client her firm was required to turn away because of this case
 
 
 [34]
 From what we know of the views held by island counsel on the issue of abortion, however, they are largely pro-choice. See note 37 infra
 
 
 [35]
 See, e.g., Jehanne Henry, Defending the Indefensible: An L.A. Lawyer Is Shunned for Taking on Radovan Karadzic as a Client, Calif. Lawyer, Oct. 1996, at 16 (describing work by Los Angeles lawyer and former federal prosecutor Edward M. Medvene on behalf of alleged Bosnian Serb war criminal); id. (quoting former Attorney General Ramsey Clark, who is representing Karadzic in a civil suit, as stating: "If you believe in rights, you defend them.")
 
 
 [36]
 Michael Tigar, Demjanjuk v. Petrovsky, 10 F.3d 338 (6th Cir. 1993) (fighting extradition of alleged Nazi war criminal); Walter H. Pollak, Powell v. Alabama, 287 U.S. 45, 77 L. Ed. 158, 53 S. Ct. 55 (1932) (defending black men against charges of raping two white women); Sarah Weddington, Roe v. Wade, 410 U.S. 113, 35 L. Ed. 2d 147, 93 S. Ct. 705 (1973); Stephen Jones, see George Lane, "McVeigh Team Says John Doe 2 Still Sought," Denver Post, May 3, 1996, at B4 (defending Timothy McVeigh against charges of bombing the Murrah Federal Building in Oklahoma City); Lynne Stewart, see "Sheik and Nine Others Convicted in Bomb Plot," Baltimore Sun, Oct. 2, 1995, at 1A (defending Sheik Abdel Rahman against charges of masterminding the plot to bomb the World Trade Center); William M. Kunstler, Texas v. Johnson, 491 U.S. 397, 105 L. Ed. 2d 342, 109 S. Ct. 2533 (1989) (defending Johnson against charges of flag desecration); Yoram Sheftel, see "Vilified Defender of the Faith," Financial Times, May 28, 1994, at 22 (defending John Demjanjuk in Israeli courts against charges of mass murdering Jews at Treblinka); Jonathan Goldberg, see Ann Shoket, Defense Against All Odds, Am. Law., Apr. 1996, at 35 (defending Yigal Amir against charges of assassinating Yitzhak Rabin); Mikhail Wladimiroff, see William W. Horne, For the Record: Mikhail Wladimiroff, Am. Law., Apr. 1996, at 71 (defending Dusko Tadic in the International Criminal Tribunal for Bosnian war crimes); Jacques Verges, see Frederick Painton, A Verdict on the Butcher, Time, Jul. 13, 1987, at 40 (defending Klaus Barbie against charges of crimes against humanity)
 
 
 [37]
 The only evidence in the record that anybody had difficulty getting a lawyer involved defendant Leticia V. Espaldon. According to Attorney General Barrett-Anderson, "It was extremely difficult to find any attorney on Guam willing to [represent Espaldon] primarily because of their personal beliefs[.] Patrick Wolff was finally persuaded to represent [her] due in part to their family ties." Barrett-Anderson Decl. at 2
 
 
 [38]
 These days, even losing a big case - particularly one that "could not be lost" - can enhance a lawyer's reputation: "[Marcia] Clark, the defeated deputy district attorney, has emerged as the [O.J. Simpson] trial's biggest winner, racking up a $4.2 million book deal, a string of speaking engagements for a fee of up to $22,000 apiece, and the sort of celebrity and public adulation normally accorded superstar actors and athletes." Thomas Fields-Meyer et al., O.K. After O.J., People, Mar. 18, 1996, at 84. Go figure
 
 
 [39]
 The majority is apparently persuaded by the fact that " none of these [other] lawyers came forward to say they would have taken this case." Maj. op. at 14569 n.4. It's not exactly clear to me how or why they would have done this. Last I heard it is still an ethical lapse for a lawyer to try to offer his services to a client represented by another lawyer
 
 
 *
 The majority may remember Mr. Trapp. He appeared before this panel in the principal case; his client's conviction was partially reversed and partially affirmed. Perez, 67 F.3d at 1386